Petition of The **UNITED STATES** of **America, a sovereign nation, as owner of the UNITED STATES COAST GUARD VESSEL INVINCIBLE, Official Number 52300, for exoneration from or limitation of liability.**

Civ. No. 62–23.

United States District Court
D. Oregon.
March 26, 1963.

---

Douglas M. Fryer, Atty., Admiralty & Shipping Section, Dept. of Justice, Seattle, Wash., and Sidney I. Lezak, Acting U. S. Atty., Portland, Or., for petitioner.

James R. Ellis and John A. Gose, of Preston, Thorgrimson, Horowitz, Starin & Ellis, Seattle, Wash., and A. E. Glickman, Milwaukie, Or., for claimants.

KILKENNY, District Judge.

The claimants, Onalue Bolam, Administratrix of the Estate of Robert Bolam, Deceased; Mary Louise Sigurdson, Administratrix of the Estate of Ted Arnold Sigurdson, Deceased; and Roy Furfiord instituted this suit in admiralty under the Public Vessels Act, 46 U.S.C. § 781 and the wrongful death statute of

the State of Washington, RCW.[1] Later, the United States filed its Petition for Exoneration from or Limitation of Liability. The claimants were ordered to answer and prosecute their claims under the Petition and by such Order all other legal proceedings were enjoined. In due course, claimants filed their answers and claims for damages. The issues of exoneration, limitation and damages on the three claims have been ordered tried in petitioner's limitation proceeding. Default has been entered against all other possible claimants.

The record discloses, and I find, that on the afternoon of January 28, 1960 the fishing vessel BARBARA LEE capsized on the Grays Harbor Bar while attempting to tow the INVINCIBLE, a disabled United States Coast Guard Vessel. At approximately 8:00 A.M. on that day the BARBARA LEE left Westport, Washington and proceeded north along the coast to set crab traps. The vessel was a 57-foot purse seine fishing unit built new for the claimant, Roy Furfiord, in 1949. The BARBARA LEE was in command of her skipper, decedent Robert Bolam, and with him were two fishermen, Ted Arnold Sigurdson and Harold Pernula. When the traps were set the BARBARA LEE proceeded south toward the entrance of Grays Harbor with the intention of returning to Westport.

Located at Westport, about four miles inside the harbor entrance, is the Grays Harbor Lifeboat Station. On the afternoon in question, the commanding officer was absent from the station. Chief Boatswain's Mate Putnam was the acting officer in charge. About 2:30 P.M. the wind had freshened from the southwest to about 30 miles per hour with some stronger gusts and about that time the station called the BARBARA LEE by radio and obtained her position. Putnam was aware of the fact that a heavy ebb tide would be running out across the Bar when the BARBARA LEE reached that area. Such condition makes the Grays Harbor Bar one of the roughest and most dangerous on the Pacific Coast. Visibility of the Bar was obscured by a light rain and fog and Putnam concluded to send a boat on Bar Patrol to determine the true conditions on the Bar and to be available to assist the BARBARA LEE, if necessary. There is some dispute as to whether the vessel selected, the INVINCIBLE, was sent out on a regular patrol. This, to me, is of no significance. The INVINCIBLE was a 52-foot vessel, specially built for rough and dangerous waters such as the Grays Harbor Bar. It is described in the Coast Guard Manual as "self-bailing, self-righting, virtually unsinkable" and is "designed to withstand the most severe conditions that can be encountered at sea". The INVINCIBLE was built in 1935. It carried a crew of four as a normal complement and on the occasion in question carried a full crew. Boatswain's Mate Second Class Miller, serving as Coxswain; Marvin Johnson serving as Engineer; Boatswain's Mate Third Class Meier and Seaman Apprentice Carl Roley, serving as seamen and line handlers. Miller selected the crew. Apprentice Seaman Roley was inexperienced. He had never crossed this Bar in rough weather and before this trip had never been aboard the INVINCIBLE when she was underway. He became seasick shortly after the vessel left the slip, went below before it reached the Bar, and was totally incapacitated and took no part in the activities which followed. The INVINCIBLE left her mooring at Westport at approximately 3:00 P.M. Sea conditions were good inside the Bar and the INVINCIBLE proceeded to go around the south jetty across the Bar where she encountered a moderate swell from a southerly direction. When she reached Buoy No. 6 she called the BARBARA LEE by radio and the two vessels rendezvoused in the vicinity of Buoy No. 2. A shouted conversation was held between Miller and Bolam, in which there was a misunderstanding. Miller thought the BARBARA LEE intended to stay outside the Bar, but Bolam had no such

---

1. Revised Code of Washington 4.20.010, 4.20.020.

intention. Miller called the Station and advised that the BARBARA LEE was staying out and the INVINCIBLE was going to cross back in. Both vessels started back across the Bar at approximately the same time. The BARBARA LEE proceeded on a northeasterly course quite close to the line of Buoys on a more or less straight line to Buoy No. 8 off the end of the south jetty. The two vessels followed in parallel courses with the BARBARA LEE close to the Buoy line and the INVINCIBLE approximately 500 feet off-shore from the Buoy line and a little behind the BARBARA LEE. The BARBARA LEE slowed down to let some large waves pass under her, but she successfully crossed the Bar, passed Buoy No. 8 and made the turn behind the lee of the westerly end of the south jetty, which might be considered a place of safety. When the INVINCIBLE reached a point abeam of Buoy No. 8 it had approximately 600 feet to go before reaching the protection of the jetty. At this point, Miller looked back and saw a big wave building up on his starboard corner. He did not have time to turn his bow into the wave so he put his wheel hard to the left to take the wave on the stern. The INVINCIBLE turned slowly in heavy seas, but Miller was successful in turning the stern part way into the breaker, yet not sufficient to prevent the wave from breaking over her and causing her to roll between 90° to 100° to port. When this occurred, Miller and Meier were on the fire bridge, Johnson was in the pilot house, and Roley was below. Miller and Meier hung on and came back up as the vessel righted itself. Meier, Johnson and Roley were not injured, Miller received a cut on the thumb and a severe cut on his head. During the course of the roll the engine stalled on the INVINCIBLE. It seems that water entered the engine through its single, unbaffled exhaust stack. When the vessel righted itself Johnson came out of the pilot house and went to the engine room and tried to start the engine. It would not start. The radio was damaged by water from a leaky porthole and would

not transmit. Miller ran to the bow and motioned to the BARBARA LEE, which had then stopped in the lee of the jetty. The skipper of the BARBARA LEE responded to the request for aid, turned about and proceeded toward the INVINCIBLE. While the BARBARA LEE was so proceeding, Miller went aft, reached through the deck, grabbed the INVINCIBLE'S tow line and started pulling it on deck. He told the BARBARA LEE to call the station. She called the station and was directed to take the INVINCIBLE'S tow line and take her in tow. Bolam ordered Pernula and Sigurdson to put on life jackets, which they did. He did not put on a life jacket.

During the roll the two towing hawsers, lines, fenders and hose of the INVINCIBLE were tangled into a confusing mass of kinks and knots. The efforts of Johnson, Miller and Meier produced little more than 100 feet of hawser out of the lazaret. A heaving line was thrown to the BARBARA LEE and this line was tied to the INVINCIBLE. About 75 feet of hawser was payed out to the BARBARA LEE and was there tied to her port cleat. The other end was tied to the anchor winch on the bow of the INVINCIBLE. On the first surge the tow line slipped on the anchor winch of the INVINCIBLE, was badly chafed and on the second surge the hawser broke at the chafe. Subsequently, the active crew of the INVINCIBLE secured an additional 100 feet out of the lazaret and payed it out to the BARBARA LEE. This was tied to the remainder of the broken line from the first tow. The total length of hawser payed out from the bow of the INVINCIBLE was then between 175 and 200 feet for this second tow. During this period of time a four mile per hour ebb tide current was carrying both vessels farther away from the south jetty and nearer the breaking sea of the spit area. The second tow was being successfully carried out until a "sneak wave" or "breaker" struck the BARBARA LEE broadside on the starboard beam and the force of the wave caused the BARBARA LEE to capsize. Sigurdson was not seen

again until his body washed up on the beach some two weeks later. Bolam had been thrown in the water, came up and grabbed a piece of broken mast. Later, Pernula gave Bolam assistance and pulled him up on a board. Pernula then swam and pushed the board and Bolam approximately 200 feet to the side of the INVINCIBLE. He shouted to the men on the INVINCIBLE to throw him a line or a life jacket or some floating object that they could get hold of.

At that time only Miller and Johnson were on deck. Meier was below. The top side life rings and heaving lines on the INVINCIBLE had been washed overboard on the roll. Pernula finally succeeded in getting hold of a life line of the INVINCIBLE but he was nearly exhausted at that time and Bolam was unconscious. A sharp wave pulled Bolam out of Pernula's grip, at which time Bolam slipped off the board and disappeared. Pernula was pulled aboard the INVINCIBLE by Miller and Johnson.

Thereafter, the INVINCIBLE drifted out across the north spit area for a considerable period of time. An anchor was then dropped in about 90 feet of water, at which time she cut the BARBARA LEE tow line with a knife and permitted it to drift.

A 36-foot motor lifeboat left the lifeboat station at approximately 4:30 P.M. Shortly thereafter her electrical system shorted out and she lost her navigating light. A short time later her radio failed to function and she lost the use of her compass. The 36-footer looked for the INVINCIBLE and the BARBARA LEE and finally spotted a flare sent up by the INVINCIBLE. When the 36-footer reached the INVINCIBLE she took her in tow and held her for approximately an hour until the Coast Guard Vessel, the McLANE, arrived. Shortly thereafter the 36-footer became disabled and she was taken in tow behind the INVINCIBLE. No search was made for the floating hulk of the BARBARA LEE or for Ted Sigurdson. The BARBARA LEE pounded ashore on the beach near Co-palis, Washington. Bolam's body was never recovered.

The evidence is very clear that the sea was exceptionally heavy and the Grays Harbor Bar exceptionally dangerous at the time of the attempted rescue operations. The "sneak" waves which disabled the INVINCIBLE and capsized the BARBARA LEE were unusual, even for the dangerous Grays Harbor Bar.

In substance, claimants charge petitioner with negligence in the following particulars:

(1) Failure to equip the INVINCIBLE with a safe exhaust system, and adequate radio and other proper gear.

(2) In putting to sea with inadequately trained personnel and in a vessel without proper towing or life saving gear or equipment.

(3) In placing the INVINCIBLE in a position of peril.

(4) In inviting and ordering the BARBARA LEE to rescue the INVINCIBLE.

(5) Failing to have an emergency vessel available and ready for assistance and rescue.

(6) Failing to use an adequate length of towing line or to properly secure such line during the attempted rescue.

(7) In negligently failing to rescue decedent Bolam after he approached the side of the INVINCIBLE.

(8) In permitting the BARBARA LEE to get away and pound ashore to her heavy damage.

(9) In failing to make a reasonable effort to secure the BARBARA LEE or save Ted Sigurdson by the use of other vessels which should have located them and to properly equip such ships.

(10) In failing to exercise due care on the rescue of Bolam, by either throwing an adequate heaving line, putting overboard a life raft or throwing a life jacket or other

floating object to which he might be secured.

Additionally, claimants charge that the INVINCIBLE was unseaworthy in the particulars alleged in subparagraphs (1), (2) and (9) of the specifications of negligence.

The petitioner contends that it is entitled to exoneration from liability since:

(a) Neither petitioner nor its employees were negligent and, even if any negligence be proved, such negligence was not the proximate cause of the damages sustained by claimants.

(b) Claimants are not entitled to a warranty of seaworthiness.

(c) The INVINCIBLE was seaworthy and, even if any unseaworthiness be proved, such unseaworthiness was not the proximate cause of damages sustained by claimants.

(d) That the law of salvage controls the rights and liabilities of the parties.

Petitioner also charges that claimants were guilty of contributory negligence and assumed any risk of capsizing in the breaking seas.

The salient facts in the case are, for all practical purposes, undisputed. Manifestly, the heavy seas, the ebb tide and the high wind then and there existing, made the Grays Harbor Bar redolent with peril and rendered extremely dangerous the attempted rescue of the much heavier INVINCIBLE by the comparatively light BARBARA LEE. In my opinion, the INVINCIBLE was on a routine cruise at the time of the outgoing passage of the Bar. I am convinced that, at the time of the rendezvous, the skipper of the BARBARA LEE did not feel he was in need of assistance and that he made no previous request for such assistance by radio, or otherwise. This finding is borne out by the records of the Station and by what actually happened at the time of the rendezvous. Moreover, at the time of starting the inward crossing of the Bar, each vessel was entirely independent of the other and the INVINCIBLE was in no way escorting or helping the BARBARA LEE.

On the inward crossing the BARBARA LEE had no difficulty in crossing the Bar and had reached a place of safety when the "sneak wave" passed over the INVINCIBLE and once again demonstrated the might and power of the relentless sea, even against those vessels that bear names which would indicate defiance. True enough, one member of the crew was seasick and the motor of the INVINCIBLE probably stopped by the reason of the entry of water through its smokestack, but it was not the alleged unseaworthiness of the INVINCIBLE, nor negligence on the part of petitioner or its employees which proximately caused this violent roll and partial capsize. The proximate cause of the INVINCIBLE lying dead in the heavy seas was the taking of the "sneak wave", the approach of which was not and could not have been anticipated by the master or crew of the INVINCIBLE, in time to avoid its devastating effect. To be kept in mind is that we are here measuring the conduct of man against the mighty efforts of that most dangerous and resolute of all enemies—a violent sea on a dangerous bar. After this casualty the INVINCIBLE was nothing more than a helpless and incapacitated derelict in a heavy sea. On her were four badly shaken and confused seamen who were attempting to survive. Even though the vessel was named the INVINCIBLE and had been designated as unsinkable, the fact remains that at that very moment she was entirely impotent, and her crew was in extreme peril. This fact was immediately recognized by the master and crew of the BARBARA LEE. Although under no obligation to do so, they immediately followed the human impulse to rescue those in distress and forthwith accepted the invitation for assistance extended by the master and crew of the INVINCIBLE. The BARBARA LEE was already engaged in rendering this assistance at the time it received some type of a radio message from the Coast

Guard Station to "throw a line to the INVINCIBLE". The roll of the INVINCIBLE had rendered all of her equipment topsy-turvy and the lines, ropes and hawsers were in a confused mess. The first line to the BARBARA LEE seemed to be too short and parted on the first power surge. The next line was much longer. During all of this period of time the crew of the BARBARA LEE was living up to the best traditions of the sea in their attempts to answer the call of their fellow seamen in distress. Then when complete success appeared on the horizon and the BARBARA LEE had the INVINCIBLE securely in tow, the furious sea again produced one of its "sneak waves," which appeared from nowhere, rolled over the BARBARA LEE and caused her to completely capsize. Whether the efforts of the members of the crew of the BARBARA LEE were expended for personal gain in a salvage operation to save the INVINCIBLE, or whether the efforts were extended to rescue fellow seamen, the fact remains that the crew of the BARBARA LEE was engaged in a salvage operation and successful or not they might have been entitled to a substantial salvage reward. The effort resulted in a tragic sea disaster.

When the BARBARA LEE capsized Sigurdson disappeared into the sea, from which he was washed ashore some two weeks later. The skipper, Robert Bolam, was severely injured, and, the absence of his life jacket made rescue more difficult. Thence forward an entirely separate and distinct rescue unfolded itself. Pernula, with the courage and tenacity of an exceptionally brave man, by great effort managed to hold on to the then unconscious Bolam and swim some distance to a line reach of the INVINCIBLE. In the meantime, the active members of the crew of the INVINCIBLE, including the injured skipper, were making every effort to effect a rescue. No trier of the facts could observe these witnesses and listen to their testimony without arriving at the conclusion that they lived up to the finest traditions of

the sea and performed every duty which would be required of a reasonable, prudent seaman under like circumstances and conditions. Had it not been for another unexpected wave, in which Bolam disappeared, it is possible that this splendid effort of the stricken crew would have saved Bolam, as well as Pernula. Whether Bolam would have lived is an entirely different question. He was unconscious for a considerable period of time before he disappeared. A monument to the efforts of the crew of the INVINCIBLE, is the living Pernula. The conduct of these men must be measured by the fact that they were occupying a powerless ship that, at any time, might take another roll and toss them to their death. Even to stay on deck, under such circumstances, would challenge the courage of a brave man.

■ The death of Sigurdson and Bolam and the damage and loss to the BARBARA LEE were caused solely and only by the action of the sea in causing a mighty "sneak wave" to suddenly approach and capsize the INVINCIBLE.

## UNSEAWORTHINESS

■■ As a general rule the warranty of unseaworthiness, which imposes strict liability in admiralty, only applies to the crew of the vessel and her cargo. The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760. The Caledonia, 157 U.S. 124, 15 S.Ct. 537, 39 L.Ed. 644. The warranty has been extended to a longshoreman performing the duties of a seaman, Seas Shipping Co., Inc. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), and to a longshoreman injured ashore by unseaworthy gear of the ship, Strika v. Netherlands Ministry of Traffic, 185 F.2d 555 (2 Cir., 1950); Revel v. American Export Lines, Inc., 266 F.2d 82 (4 Cir., 1959). I do not believe that the warranty should be extended to decedents or to the BARBARA LEE under the facts and circumstances of this case, Belgrano v. Weigel, 299 F.2d 897 (9 Cir., 1962). Be that as it may, I have already found and established that the proximate cause of this loss of the lives

of Bolam and Sigurdson and the damage to the BARBARA LEE was the "sneak wave" previously mentioned. That loss I find was entirely unconnected with any possible unseaworthy condition of any of the Coast Guard vessels.

## CLAIMANTS' RIGHT OF ACTION

Although my findings on the facts are decisive on the question of liability, I feel that the parties are entitled to my views on the applicable law.

■ The alleged maritime torts having occurred in the territorial waters of the State of Washington are actionable under the laws of that state. Goett v. Union Carbide Corp., 361 U.S. 340, 80 S.Ct. 357, 4 L.Ed.2d 341; The Tungus v. Skovgaard, 358 U.S. 588, 79 S.Ct. 503, 3 L.Ed.2d 524; Hess v. United States, 361 U.S. 314, 80 S.Ct. 341, 4 L.Ed.2d 305; 46 U.S.C. § 781; R.C.W. 4.20.010–4.20.020.

■ Under proper circumstances such a claim may be prosecuted against the United States for the negligence of the Coast Guard under the Federal Tort Claims Act. Indian Towing Co., Inc. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48; Geertson v. United States, 223 F.2d 68 (3 Cir., 1955); United States v. Gavagan, 280 F.2d 319 (5 Cir., 1960).

## NEGLIGENCE

■ None of the cases cited by claimants would point to negligence on the part of the Coast Guard or its crew or to proximate causation under these facts and circumstances. For that matter each case, cited by claimants in support of their arguments, is readily distinguishable from the factual background before this court. The fact that the INVINCIBLE was helpless and drifting on a dangerous bar placed her in a condition of marine peril. The Alaska, 23 F. 597 and (S.D.N.Y.1885); The Mercer, 297 F. 981 (2 Cir., 1924); City of Puebla, 79 F. 982 (N.D.Wash.1897). The signal of the skipper of the INVINCIBLE for assistance invited the BARBARA LEE to a salvage service. The Roanoke, 214 F. 63 (9 Cir., 1914); The Flottbek, 118 F. 954, 964 (9 Cir., 1902). The crew of the BARBARA LEE was under no obligation to assist the INVINCIBLE either at the request of the skipper or on command of the Coast Guard. The rescue or salvage operations could have been abandoned, without liability, even after the parting of the first line. Warshauer v. Lloyd Sabaudo, S.A., 71 F.2d 146 (2 Cir., 1934).

■ As was very aptly said in Irwin v. United States, 236 F.2d 774 (2 Cir., 1956) where a casualty was caused by a "freak wave" "[e]ven the United States is not master of the sea and the wind * * * *". Abundantly clear is the fact that the INVINCIBLE was a helpless derelict. The heaving lines were washed away, the life rings were lost, the life jackets were stowed below deck and if available could not be thrown into the strong wind. The only available line was actually thrown by Johnson and did save the life of Pernula. Although claimants argue that a seaman aboard a Coast Guard vessel must exercise a higher degree of care than the average seaman, no case has been cited to support such a position. Even if they are to be viewed as "experts", their conduct must be judged in the light of the dangerous conditions under which they were working. It has been said that the responsibility of the Coast Guard rises no higher than that of a private salvor in an attempted rescue operation. Frank v. United States, 250 F.2d 178, 179 (3 Cir., 1957). United States v. Gavagan, 280 F.2d 319, 325 (5 Cir., 1960), on which claimants rely, recognizes that the negligence in that case consisted of the mistakes of those who were ashore, rather than the hard choices of those who might be working under the pressure of the competing perils of the sea while a ship was in extremis. The Gavagan does not help the claimants' position. Nothing was done by the crew of the INVINCIBLE nor by the Coast Guard which in any way *worsened* the positions of Sigurdson, Bolam, or the ship after the capsize of the BARBARA LEE. Already

I have held, that the proximate cause of such capsize was the "sneak wave", rather than any negligence on the part of the Coast Guard or the crew of the INVINCIBLE or the alleged unseaworthiness thereof. What happened before that time is of no importance in passing on the question of liability.

Cases such as Wagner v. International Railway Company, 232 N.Y. 176, 133 N.E. 437, 19 A.L.R. 1 (1921) are not in point. That case did not involve an attempted rescue under maritime law. I recognize that maritime law should grow and change by judicial decision to meet the needs of the changing social and merchandising relationships. Judge Cardozo wrote the Opinion in the Wagner case in 1921. However, the Federal Courts have not seen fit to expand the field of maritime law to make the principles announced by Judge Cardozo completely applicable to a rescue at sea. The leading Federal authority is P. Dougherty Company v. United States, 207 F.2d 626 (3 Cir., 1953). In that case the court held that it would be "unthinkable" to expose the men of the Coast Guard to the double jeopardy of possible loss of life and loss of status in their own chosen careers, because they failed, in coping with the intrinsic perils of navigation, to select the most desirable of available procedures, or that from that their skill was not equal to the occasion. Moreover, the railroad in Wagner was clearly negligent and such negligence caused the condition to exist. Such is not the fact in this case.

■ Claimants' reliance on United States v. Lawter, 219 F.2d 559 (5 Cir., 1955) is also misplaced. There, the uncontradicted evidence showed that the Coast Guard affirmatively took over the rescue operation, excluding all others therefrom, and thus not only worsened the position of the decedent but negligently brought about her death. There is nothing in the present record to show that the Coast Guard "worsened" the condition of decedents or the BARBARA LEE. As a fact, I find that the evidence affirmatively shows that their position was not worsened. The Lawter case would be in point on Bolam's claim if Bolam had secured a line and a member of the crew of the INVINCIBLE started pulling him in before he had secured the line to his body and then had stopped raising Bolam over the side of the ship before Bolam was secured. Of course, no such state of facts exist in this case and, consequently, the decision in Lawter is here of no importance.

■ Throughout their arguments, claimants contend that they are entitled to the benefit of the substantive of law of the State of Washington as it would be applied by the Courts of that State in a proceeding of this kind. It is true that the general maritime law has been supplemented in many fields by State Legislation. Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L. Ed. 143 (1953); The Tungus v. Skovgaard, 358 U.S. 588, 592, 79 S.Ct. 503, 3 L.Ed.2d 524. In the latter case it was held that where admiralty adopts a state right of action for wrongful death, it must enforce the right as an integrated whole with whatever conditions and limitations might be attached. In Goett v. Union Carbide Corp., 361 U.S. 340, 80 S.Ct. 357, 4 L.Ed.2d 341 (1960), the Supreme Court remanded the cause to the Court of Appeals to determine whether the West Virginia Wrongful Death Act employed the West Virginia or the general maritime law concept of negligence and whether that act incorporated the doctrine of unseaworthiness in death actions involving maritime courts. I do not believe there is sufficient difference between the concept of negligence under Washington Law and the concept of negligence under Maritime Law, to cause a different result in this case. In Roswall v. Grays Harbor Stevedore Co., 132 Wash. 274, 231 P. 934, 935 (1925), the Washington Court held that notwithstanding the fact that the death action might be brought in a common law court of the State of Washington, the action when so brought is not to be measured by common law standards, but is one of maritime cognizance. In the last anal-

ysis, it is not important whether I apply the general maritime law or the common law as interpreted by the State of Washington. Under my findings on the facts, neither theory would create liability. After all, substantial evidence of fault and proximate causation have always been required under the Washington decisions. Wilson v. Northern Pacific Railway Co. (1954), 44 Wash.2d 122, 265 P. 2d 815; Nelson v. West Coast Dairy Co. (1940) 5 Wash.2d 284, 105 P.2d 76, 130 A.L.R. 606; Ross v. Great Northern Railway Company, 315 F.2d 51 (9 Cir. March 13, 1963). Certainly, there is nothing in the Washington law which would make petitioner an insurer of the safety of the crew of the BARBARA LEE. In order to permit a recovery, I would be compelled to so hold.

The emergency doctrine, relied on by claimants, Sandberg v. Spoelsha, 46 Wash.2d 776, 285 P.2d 564 cannot be employed on the facts in this case. Simply stated, I find that the massive "sneak wave" created by the violent storm was the proximate cause of the capsize and damage to the BARBARA LEE and the resulting deaths of the two decedents.

I have thoughtfully examined the other authorities cited by claimants on their theories of negligence and unseaworthiness. None of the authorities are helpful on a state of facts such as is here presented.

All specifications of negligence and unseaworthiness as set forth in the Pre-Trial Order and supplements, and as argued in claimants' briefs have received my attention. The proofs do not substantiate any one or more of such specifications as a proximate cause of the loss of the vessel or the deaths of either one of the decedents. The claim that the McLANE and the CG–36469, the Coast Guard Vessels dispatched on a mission of assistance by the Coast Guard, should have located the floating hulk of the BARBARA LEE and that they might have rescued Sigurdson is nothing more than pure conjecture and wild speculation. Our profound sympathy for the bereaved families of the decedents, shared by the Court and all others connected with this litigation, cannot be substituted for legal liability. All charges of fault are without merit.

## OTHER QUESTIONS

Although my previous findings have made unnecessary a decision on other issues raised by the parties, I feel that an appellate court might want the benefit of my views on some of those issues.

## CONTRIBUTORY NEGLIGENCE

I feel that the members of the crew of the BARBARA LEE were faced with the same grave problem as those faced by the members of the crew of the INVINCIBLE and that neither Bolam nor Sigurdson were negligent in any manner proximately contributing to their deaths. On first thought it might seem that Bolam should have been wearing his life jacket. We must remember that he was in command of the BARBARA LEE, and, no doubt in directing the rescue and salvage operation had much more on his mind than securing a life jacket. His conduct must be measured by the grave consequences to others of an error in his judgment under the unusually dangerous and hazardous conditions then and there existing. Neither he nor Sigurdson were negligent. As previously mentioned, their deaths were caused solely and only by the action of the "sneak wave" in capsizing the INVINCIBLE.

## LIMITATION OF LIABILITY

Under the facts of this case and the manner in which the issue is presented, I do not feel that there should be a limitation of liability, even though liability existed.

## LAW OF SALVAGE

On a proper presentation of issues, I feel that claimants would be entitled to present their claims under the law of salvage. Without question the BARBARA LEE first notified the Coast Guard of the helpless condition of the INVINCIBLE and it was this notice that sent the other vessels on the search

which resulted in the salvage of the INVINCIBLE. The issue as to the amount of salvage, or a proper division thereof, was not presented under the Pre-Trial Order nor in the evidence. I am limited to the issues created under the Pre-Trial Order.

Petitioner's claim for exoneration is granted. I adopt this Opinion as my findings on the issues involved. Proctors for petitioner shall prepare and submit an appropriate decree in conformity with this Opinion.