**Llewellyn E. HOOD and Southern American Insurance Company**

v.

**UNITED STATES of America.**

**Civ. A. No. 86–4250.**

United States District Court, E.D. Louisiana.

Aug. 8, 1988.

Robert C. Evans, New Orleans, La., for plaintiffs.

William F. Baity, Asst. U.S. Atty., New Orleans, La., John Edward Wells, IV, U.S. Dept. of Justice, Washington, D.C., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ROBERT F. COLLINS, District Judge.

This is an admiralty case in which the United States of America has been sued for the failure of the Coast Guard to salvage a sinking vessel.

Having considered the testimony, exhibits, memoranda of law and arguments of counsel, the Court makes the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52.

### Findings of Fact

1. The F/V CHERYL LEE was a diesel powered, fiberglass hulled fishing vessel built in 1982. The F/V CHERYL LEE was 51 feet in length and had a breadth of 17 feet. At all material times herein the F/V CHERYL LEE was owned by Llewellyn E. Hood.

2. On the morning of March 26, 1986, Captain Hood and his three crew members, Frank Horan, Guy McClave and Walter Hood, were long-line fishing aboard the F/V CHERYL LEE, approximately 21 miles southeast of Marathon, Florida in moderate seas.

3. QM1 Thomas King, the Coast Guard Search and Rescue Controller at Key West, received a call on VHF radio channel 22 from the F/V CHERYL LEE at 11:47 a.m. The fifty-one foot CHERYL LEE reported that she was taking on water, and due to battery failure had no bilge pump. The source of the flooding was reported as the after lazarette. The CHERYL LEE radioed her position, number of persons on board and a description of the vessel. Controller King told the crew of the CHERYL LEE to don their life jackets, get their raft ready and to activate their emergency beacon (EPIRB).

4. The call from the CHERYL LEE was heard by Coast Guard Station Islamorada. The Search and Rescue Controller at Key West, King, instructed Coast Guard Station Islamorada to send a Coast Guard Search and Rescue vessel to the reported position of the CHERYL LEE. The Station Islamorada Log reflects this call was received at 11:51 a.m. The Officer of the Day at Coast Guard Station Islamorada was MK2 Richard Anderson.

5. There are three Coast Guard Stations that operate under Group Key West's area of responsibility: Coast Guard Station Key West; Coast Guard Station Marathon; and Coast Guard Station Islamorada. In turn, Group Key West is overseen by Seventh Coast Guard District Headquarters in Miami.

Search and Rescue Operations in the District are governed by the National Search and Rescue Manual. When a distress signal is received, such as the radio call from the CHERYL LEE, the Search and Rescue System (SAR) is activated. There are five SAR Stages: (1) Awareness; (2) Initial Action; (3) Planning; (4) Operations; and (5) Mission Conclusion. The Awareness Stage is defined as awareness that an emergency situation may exist.

SAR incidents are by definition emergency events and are classified by phase as the emergency develops. There are three phases: the uncertainty phase; the alert phase; and the distress phase. From the time of the initial radio communications, the CHERYL LEE incident was in the distress phase, i.e., immediate assistance was required because the safety of a craft or person was being threatened by a grave and imminent danger. This is important because a case in the distress phase means there are lives at stake.

In the Seventh Coast Guard District, Miami SAR Subregion, SAR Operations are controlled and coordinated by the Rescue Coordination Center (RCC) at Headquarters in Miami. The RCC Controller on duty was LT Michael Hudson. Thomas King held the designation Search and Rescue Controller at Key West, a subsection of the MIami SAR Subregion. Anderson and his supervisor, BM1 James Flanagan, Officer in Charge of Station Islamorada, acted as SAR Incident Coordinator. The Commandant of the Coast Guard has directed the various Coast Guard Districts to promulgate procedures for carrying out his formulation of a Non–Emergency Commercial Assistance Policy, whereby private enterprise will assume some functions which have been caried out by the Coast Guard in the past. Non-emergency assistance cases involve no reasonably foreseeable threat to life. The Commandant's Policy did not apply to the case of the CHERYL LEE because this was an Emergency Search and Rescue Operation, in the Distress Phase, from the initial radio call. Both the Station Islamorada Officer of the Day, Anderson, and the Group Key West Controller, King, considered the CHERYL LEE's plight as calling for an Emergency Search and Rescue Response. RCC Controller Hudson agreed. The Coast Guard's conclusion that the appropriate response to the CHERYL LEE's distress call should be an Emergency Search and Rescue Operation was without doubt proper and reasonable under the circumstances.

6. At 11:56 a.m., the Coast Guard 41493, a forty-one foot Coast Guard Search and Rescue Boat, was underway from Station Islamorada headed for the CHERYL LEE. The CG 41493 carried a crew of five. The Coxswain of the CG 41493 was Harlan Salmona.

7. At 12:02 p.m., Thomas King called the Seventh Coast Guard District Rescue

Coordination Center (RCC) in Miami on the hot line reserved for that purpose. King briefed the RCC Controller, LT Michael Hudson, on the situation. King told him the Search and Rescue Boat had an estimated en route time of 1.5 hours. King requested Search and Rescue Aircraft. Only the RCC Controller can order aircraft to launch.

8. At 12:03 p.m., Hudson called Coast Guard Air Station Miami and requested two aircraft, a Falcon jet and an H-65 helicopter.

9. At 12:04 p.m., Hudson called King and discussed the need to obtain all pertinent information from the CHERYL LEE while there was still communication with the sinking vessel. This was important because the tone of the case at this time indicated that the vessel was sinking and persons were in the water or would be shortly.

10. At 12:08 p.m., Air Station Miami reported to Hudson that the CG 6517, an H-65 helicopter, would be airborne in ten minutes. Air Station Miami suggested substituting an H-3 helicopter for the jet because the jet was refueling and using the H-3 would take less time. Hudson agreed.

11. Meanwhile, Coast Guard Station Islamorada was in constant radio communication with the CHERYL LEE. Coast Guard logs record the substance of the conversations. Notably:

a. At 12:14 p.m., the CHERYL LEE reported that she had a 15 degree port list and that the stern was awash;

b. At 12:15 p.m., the CHERYL LEE stated water was still coming in on the stern;

c. At 12:18 p.m., the CHERYL LEE stated she was listing 20 degrees to port;

d. At 12:20 p.m., the CHERYL LEE stated she was activating her EPIRB;

e. At 12:25 p.m., the CHERYL LEE called MAYDAY to passing vessel "or any vessel." The passing freighter RODONA hove to and stood by; and

f. At 12:28 p.m., the CHERYL LEE stated that she was "sinking fast."

12. At approximately 12:30 p.m., all commuications from the CHERYL LEE ceased due to failure of the vessel's electrical system by immersion in salt water.

13. Meanwhile, the crew of Coast Guard Helicopter CG 6157 lifted off at 12:19 p.m. There was a brief conversation between Hudson and King at 12:20 p.m. regarding whether or not the crew of the CHERYL LEE were still aboard the sinking vessel or whether they were in the water. When it was determined that the crew of CHERYL LEE was not yet in the water, this was relayed to CG 6157. CG 6157 touched back down briefly and took a pump on board. At 12:23 p.m., CG 6157 was en route and the H-3 helicopter was launching. Hudson briefed Captain Rudy Peschel, Chief of Search and Rescue, at 12:25 p.m., and the Office of Public Affairs at 12:26 p.m.

14. At 12:32 p.m., the freighter RODONA stated she had the sinking vessel in sight and would stand by and assist if needed. At 12:45 p.m., Hudson diverted the second helicopter, H-3, to another casualty. A Haitian fishing vessel was breaking up and a number of persons were in the water off Port Everglades.

15. Helicopter CG 6157 arrived on the scene at 12:58 p.m. The aircraft commander, James Sellers, was the first Coast Guard unit on the scene and assumed the duties of SAR On Scene Commander. The SAR On Scene Commander assumes control in executing the mission on scene and has the authority and discretion to direct, and to modify, plans as required due to on scene conditions. Sellers observed upon his arrival that the CHERYL LEE's stern was awash and the aft one-third of the vessel was completely submerged. In his discretion, as SAR On Scene Commander, and as the Commander of a United States Coast Guard Aircraft, Sellers decided it would be useless and unsafe to approach the sinking vessel for the purpose of dropping a pump. Sellers considered hoisting the CHERYL LEE's crew to safety. However, he could see the CG 41493 approaching. A boat-to-boat transfer is safer than hoisting by aircraft. Sellers had his air-

craft orbit the scene and waited for the CG 41493 to arrive and evacuate the CHERYL LEE's crew.

16. During this series of events Captain Glenn Ward of Aquanaut Salvage had been monitoring the radio traffic. Ward was en route towards his home port in his salvage boat AQUANAUT, when he overheard the CHERYL LEE's distress calls. It is a common practice among commercial salvors to monitor the marine radio for the purpose of discovering potential salvage opportunities. Ward called his wife on another channel and asked that she phone the Coast Guard for details on the CHERYL LEE. Ward did this because he did not want to tie up the marine radio during an ongoing emergency. At 1:05 p.m., the Coast Guard asked Ward to stand by in case the CHERYL LEE signified it would accept commercial assistance. Ward called the Coast Guard and stated the position of the AQUANAUT and stated he would head to the CHERYL LEE's position in case the owner/operator of CHERYL LEE requested commercial salvage assistance. At 1:08 p.m., the Coast Guard log indicates that the CHERYL LEE signified that the owner would accept commercial assistance.

17. At 1:14 p.m., the Rescue Boat arrived on the scene. The Coxswain, Harlan Salmona, made a rapid evaluation of the situation. The crew of the CHERYL LEE was clustered on the starboard gunnel with a life raft and pile of electronic gear they had stripped from the vessel. The CHERYL LEE was awash and the stern was well submerged. The vessel was listing, unstable, and in danger of capsizing, and there was loose gear floating inside and around the vessel. It was windy and overcast, the seas were heaving in five to seven foot swells, and the weather was deteriorating. Photographs taken at the time the Rescue Boat arrived (and introduced into evidence) graphically illustrate the plight of the stricken vessel. In short, the CHERYL LEE was more sunken than afloat and in a very dangerous condition.

18. Harlan Salmona, in his discretion as the individual assuming the role of SAR on Scene Commander, and as the Master of a United States Coast Guard Vessel, determined that the CHERYL LEE was too far gone to justify risking lives to save property. Harlan Salmona's primary concern was for the lives of the persons aboard the CHERYL LEE. Salmona was in constant communication with Station Islamorada, and other Coast Guard facilities. His decision not to attempt to salvage the sinking vessel and the reasons therefore were relayed to Station Islamorada. The decision was affirmed by the Coast Guard and SAR chains of command.

19. The Rescue Boat approached the CHERYL LEE and verbal communications were exchanged between the CHERYL LEE AND CG 41493. The master of the CHERYL LEE was informed that the Coast Guard would not be undertaking the salvage of his vessel. Mr. Hood was upset to learn this, but nevertheless confirmed that he would accept Glen Ward's offer of commercial salvage assistance.

20. Salmona requested the crew of the CHERYL LEE to board the CG 41493, and they did so. At 1:23 p.m., helicopter CG 6517 and freighter RODONA departed the scene. Harlan Salmona formally assumed the role of On Scene Commander. By 1:26 p.m., the entire crew of the CHERYL LEE was aboard the CG 41493.

21. At 1:30 p.m., the CG 41493 was advised to stand by while Captain Ward and the AQUANAUT continued to come as fast as they could. Ward experienced heavy seas and took a beating as he continued toward the scene of the CHERYL LEE. The AQUANAUT was, however, the only salvage boat available.

22. The CHERYL LEE continued to sink and at 2:13 p.m., she pitched bow down, headed for the bottom.

23. By 2:30 p.m., the CHERYL LEE was eighty-five percent submerged.

24. At 3:20 p.m., when Ward and the AQUANAUT arrived, only two feet of the stern of the CHERYL LEE remained out of the water. The bow was pointed straight down.

25. The CG 41493 departed the scene and at 4:42 p.m. moored at Station Islamo-

**242**

rada, delivering the crew of the CHERYL LEE safely ashore.

26. Ward attached a wreck beacon to the stern of the CHERYL LEE and stood by until 5:26 p.m., when the stern of the CHERYL LEE disappeared completely. The AQUANAUT returned to home port.

27. There were no injuries or lives lost.

28. To the extent that these Findings of Fact also constitute Conclusions of Law, they are specifically adopted as both Findings of Fact and Conclusions of Law.

*Conclusions of Law*

1. This action is subject to the Court's admiralty and maritime jurisdiction pursuant to the Public Vessels Act, 46 U.S.C. App. 781, *et seq.*, and the Suits in Admiralty Act, 46 U.S.C.App. 741, *et seq.* (SAA), *Wellington Transportation Company v. United States,* 481 F.2d 108 (6th Cir.1973); *Kelly v. United States,* 531 F.2d 1144 (2d Cir.1976); *Canadian Aviator, Ltd. v. United States,* 324 U.S. 215, 65 S.Ct. 639, 89 L.Ed. 901 (1945); *DFDS Seacruises (Bahamas) Ltd. v. United States,* 676 F.Supp. 1193 (S.D.Fla.1987).

■ 2. There is no affirmative duty on the part of the Coast Guard to rescue or furnish assistance to a vessel in distress. The decision of whether or not to undertake a rescue or salvage is discretionary with the Coast Guard. *United States v. Gavagan,* 280 F.2d 319 (5th Cir.1960), *cert. denied,* 364 U.S. 933, 81 S.Ct. 379, 5 L.Ed. 2d 365 (1961); *Wellington Transportation Company v. United States,* 481 F.2d 108 (6th Cir.1973). If the decision is made not to provide services, then the discretionary function limitation to the SAA applies, and sovereign immunity prohibits the decision of the government official from being the basis of a SAA claim. Here, there were never any affirmative representations by the Coast Guard that it would undertake the salvage of the CHERYL LEE.

3. Once the Coast Guard makes a decision to supply a service, then sovereign immunity is waived allowing recovery for negligent actions of the government beyond the discretionary decision. *Wiggins*

*v. United States,* 799 F.2d 962 (5th Cir. 1986); *Sheridan Transportation Co. v. United States,* 834 F.2d 467 (5th Cir.1988); *Wysinger v. United States,* 784 F.2d 1252 (5th Cir.1986).

4. The Coast Guard did indeed undertake to proceed to the scene, rescue the persons aboard the CHERYL LEE, and if the circumstances warranted, render assistance to the vessel.

5. Plaintiff would have the Court find that the Coast Guard's decision to undertake the rescue of persons aboard a vessel, such as the CHERYL LEE, necessarily implicates an undertaking on the part of the Coast Guard to salvage property. This Court is unaware of any case which directly addresses this issue, but we find persuasive the reasoning set forth in a similar case.

In *Daley v. United States,* 499 F.Supp. 1005 (1980), the Coast Guard did institute a PRECOM, which is an inquiry of harbor masters and others to learn if an overdue boat has landed or been heard of elsewhere. Yet, plaintiff in *Daley* contended that upon initiating this inquiry, the Coast Guard undertook to search and rescue and had a duty to conduct the SAR with reasonable care. *Id.* at 1009. There, the Court held that undertaking the PRECOM was merely an attempt to ascertain whether further action should be taken and, absent some affirmative representation, that undertaking did not necessarily require the Coast Guard to undertake a search and rescue mission. *Id.* The decision of the Coast Guard to delay instituting the SAR was not comparable to abandoning a search already underway. *Id.*

■ 6. In the instant case, although plaintiffs contend the Coast Guard undertook to salvage the CHERYL LEE, this Court has concluded that the Coast Guard merely undertook to rescue the personnel on board and was prepared to undertake salvage of the vessel if that was feasible. Any implication that, absent affirmative representation, an undertaking to rescue necessarily requires the Coast Guard to undertake salvage of a vessel would defeat the purpose of the discretionary function

limitation. Such a ruling would "change the entire operation of the Coast Guard, and would enlarge beyond measure the government's responsibility and financial exposure." *See Daley,* 499 F.Supp. at 1010 (regarding requirement of reliance on Coast Guard's undertaking). *See also, Chute v. United States,* 610 F.2d 7, 12 (1st Cir.1979), *cert. denied,* 446 U.S. 936, 100 S.Ct. 2155, 64 L.Ed.2d 789; *United States v. Sandra & Dennis Fishing Corp.,* 372 F.2d 189, 195 (1st Cir.1967), *cert. denied,* 389 U.S. 836, 88 S.Ct. 48, 19 L.Ed.2d 98.

7. The Coast Guard decided, in its discretion, not to undertake the salvage of the CHERYL LEE. Thus, the discretionary function limitation is applicable, and the doctrine of sovereign immunity precludes this decision from becoming the basis of a SAA claim. Accordingly, plaintiffs' action against the United States must be DISMISSED with prejudice, plaintiffs to bear all costs.

8. In light of this Court's determination that the Coast Guard did not undertake to salvage, we need not reach the question of whether the Coast Guard negligently failed to salvage the CHERYL LEE. However, in case of possible appeal, we will consider alternatively plaintiffs' contention that the Coast Guard undertook to salvage the CHERYL LEE and negligently abandoned that undertaking.

9. If the Coast Guard had undertaken to salvage the CHERYL LEE, then sovereign immunity would have been waived. The liability of the United States would be governed by the same principles of admiralty law applied in suits between private parties. *Canadian Aviator, Ltd. v. United States,* 324 U.S. 215, 65 S.Ct. 639, 89 L.Ed. 901 (1945).

10. If the Coast Guard responds to a call for assistance, it is not required to provide any particular kind of equipment or man, rig, or equip its vessels in an particular way. *Frank v. United States,* 250 F.2d 178 (3rd Cir.1957); *United States v. Sandra & Dennis Fishing Corp,* 372 F.2d 189, 197 (1st Cir.1967), *cert. denied,* 389 U.S. 836, 88 S.Ct. 48, 19 L.Ed.2d 98 (1967); *Folt-*

*ting v. Kaevando,* 324 F.Supp. 585 (S.D. Tex.1971).

11. The Coast Guard is not held to any higher standard of care in its rescue or salvage operations than a private person. *Basic Boats, Inc. v. United States,* 352 F.Supp. 44, 48 (E.D.Va.1972); *Petition of United States,* 216 F.Supp. 775, 782 (D.Or.1963).

12. The Good Samaritan Doctrine applies to the Coast Guard as well as private salvors. *United States v. DeVane,* 306 F.2d 182 (5th Cir.1962); *United States v. Gavagan,* 280 F.2d 319 (5th Cir.1960), *cert. denied,* 364 U.S. 933, 81 S.Ct. 379, 5 L.Ed. 2d 365 (1961); *United States v. Sandra & Dennis Fishing Corp.,* 372 F.2d 189 (1st Cir.1967), *cert. denied,* 389 U.S. 836, 88 S.Ct. 48, 19 L.Ed.2d 98 (1967); *Patentas v. United States,* 687 F.2d 707 (3rd Cir.1982); *DFDS Seacruises (Bahamas) Ltd. v. United States,* 676 F.Supp. 1193 (S.D.Fla.1987).

13. This doctrine provides that, if a volunteer rescuer is negligent in carrying out a rescue, which proximately causes a loss or damage, and the position of the person in peril is worsened in reliance on the would be rescuer's undertaking, then the volunteer rescuer will be held liable. *De-Vane,* 306 F.2d at 186.

14. This doctrine is also restated in the Second Restatement of Torts, which states that:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if:

(a) his failure to exercise such care increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking.

*Restatement (Second) of Torts,* sec. 323 (1977).

15. Another principle set out in the Second Restatement is that:

One who knows or has reason to know that a third person is giving or is ready

to give to another aid necessary to prevent physical harm to him, and negligently prevents or disables the third person from giving such aid, is subject to liability for physical harm caused to the other by the absence of the aid which he has prevented the third person from giving. *Restatement (Second) of Torts*, sec. 327 (1977).

16. In applying these standards, the Court will not second guess the decisions made by rescue personnel in the midst of the rescue attempt. *Page v. United States*, 105 F.Supp. 99, 102 (E.D.La.1952); *Gause v. Kiffe*, 1972 A.M.C.1928 (W.D.La. 1972) [not otherwise reported]; *see Johnson v. United States*, 378 F.2d 732 (9th Cir.1967); *Furka v. Great Lakes Dredge & Dock, Inc.*, 755 F.2d 1085 (4th Cir.1985).

17. The public policy underlying the plaintiff's heavy burden of proof under the Good Samaritan Rule and the Second Restatement of Torts is outlined by the Third Circuit in *P. Dougherty Co. v. United States*, 207 F.2d 626, 634 (3d Cir.1953). That Court stated that the public policy rationale

"may be directed to the inevitable consequence on the morale and effectiveness of the Coast Guard if the conduct of its officers and personnel in the field of rescue operations under the indescribable strains, hazards and cries which attend them, is to be scrutinized, weighed in delicate balance and adjudicated by Monday-morning judicial quarterbacks functioning in an atmosphere of serenity and deliberation far from the maddening crowd of tensions, immediacy and compulsions which confront the doers and not the reviewers."

*P. Dougherty*, 207 F.2d at 634.

■ 18. Plaintiff's experts testified, after making estimated volume calculations and after estimating the *average* rate of flooding, that implementing a Coast Guard pump could have saved the CHERYL LEE. Based on the exhibits and testimony of the Coast Guard experts, this Court finds that, at the time the SAR team first arrived, the stern of the CHERYL LEE was awash and the actual rate of flooding by that time was much more than the *average* rate given by the plaintiff's experts. There was a free flow of water between the sea and the CHERYL LEE since the vessel was at least one third submerged and listing to port. Plaintiffs' Exhibit 11A. At this point, it was not an unreasonable decision on the part of both the helicopter pilot and the Coast Guard Coxswain not to deploy pumps. The Coast Guard personnel determined that dewatering would have been futile because they would have been attempting to pump out the ocean at this point.

■ 19. Further, this Court finds that the Coxswain's decision not to take the vessel in tow or move her bow into the wind was not an unreasonable one, given the vessel's apparent instability. As noted previously and as shown in photographs taken at the scene, the vessel's stern and aft deck space were completely awash, with the vessel listing unnaturally to port. Plaintiffs' Exhibits 11A and 11E. Based on the testimony of the Coast Guard's expert, Guy Sorenson, this Court finds that, given the prevailing weather conditions of five to eight foot seas, 15 to 20 knot winds, and given the bulk of the CHERYL LEE (51 feet in length and 65,000 pounds with gear) and the presence of loose equipment which could have trapped personnel on board if the vessel rolled, the Coxswain's decision was a prudent one. Another factor which reflects the reasonableness of the Coxswain's decision is the uncontroverted testimony that the Coast Guard vessel was approaching its operational limits of eight foot seas. To attempt a tow under these circumstances would have endangered the lives of the crews of both vessels.

■ 20. Finally, the Court will address plaintiff's allegations that the shoreside Coast Guard personnel negligently delayed in dispatching a commercial salvor to the scene. The Coast Guard requested the private salvor, Captain Ward of the AQUANAUT, to stand by to assist at 1:05 p.m. The Coast Guard's log indicates that the CHERYL LEE signified it would accept commercial assistance at 1:08 p.m. How-

ever, it appears that this communication must have been conveyed to the Coast Guard at some earlier time, since the CHERYL LEE's electrical system failed at approximately 12:30 p.m. The plaintiff asserts that commercial assistance was requested as much as an hour and 15 minutes earlier than reflected in the Coast Guard logs. Yet, the Court finds Mr. Horan's and Mr. Hood's testimony that commercial salvage was requested at such an early stage unconvincing. Indeed, no one seems sure when the CHERYL LEE indicated it would accept commercial salvage. This is not unusual under the circumstances. This Court is persuaded that the Coast Guard did not unreasonably delay in dispatching the AQUANAUT to the scene, once the CHERYL LEE signified it would accept commercial assistance.

Even if the AQUANAUT had headed for the scene at the time the plaintiff asserts commercial assistance was requested, the time required for the AQUANAUT's voyage (as indicated by the actual times of departure for the scene and arrival) would have placed it approximately an hour later than the Coast Guard in arriving. This court has already found the Coast Guard personnel's determination upon arrival that the vessel was not salvageable was not unreasonable. Certainly, if the AQUANAUT had been contacted immediately, the chance of salvaging the vessel upon the AQUANAUT's arrival would have been slim to none. Accordingly, this Court has determined that the Shoreside personnel did not negligently delay in contacting a commercial salvor, and, alternatively, even if the delay were as great as the plaintiff asserts, such delay was not a proximate cause of the sinking of the CHERYL LEE. *See Petition of the United States as Owner of the Coast Guard Vessel INVINCIBLE,* 216 F.Supp. 775, 783–84 (D.Ore.1963); *Page v. United States,* 105 F.Supp. 99, 103 (E.D.La.1952).

21. Insofar as these Conclusions of Law also constitute Findings of Fact, they are specifically adopted as both Findings of Fact and Conclusions of Law.

22. Based on the foregoing Findings of Fact and Conclusions of Law, this Court concludes that the Coast Guard's decision not to undertake the salvage of the CHERYL LEE will not support a claim under the Suits in Admiralty Act. Alternatively, the plaintiff has failed to carry his burden of proving negligence on the part of the Coast Guard personnel. Finally, plaintiff has failed to show that the Shoreside personnel's negligence proximately caused the sinking of the CHERYL LEE. Accordingly, plaintiffs' claims are hereby DISMISSED with prejudice, plaintiffs to bear all costs.