**HOME SHIPPING COMPANY, S. A., as owner of the S.S. COSMIC, Libellant,**

v.

**UNITED STATES of America, Respondent.**

**No. 1783.**

United States District Court
D. Delaware.

March 2, 1965.

of the center line of Deepwater Point Range of the Delaware River.

It is the judgment of this Court based upon the following Findings of Fact and Conclusions of Law that the respondent was guilty of no negligence in the marking of the wreck which contributed in any manner to this collision with the result that the Government is not liable. However, it is thought desirable, following the Findings of Fact and Conclusions of Law, to set forth briefly the reasons why libellant's contentions as to respondent's liability are not well founded.

### FINDINGS OF FACT

1. The SS COSMIC was a Liberian-flag, Panamanian-owned, Greek-operated combination oil and ore carrier, 744.1 feet long, 100.9 feet wide, with her housing on the stern, the bridge being 625 feet aft of the bow.

2. The MISSION, a Government tanker (owned by the United States) sank on March 7, 1957, after colliding with the SS ELNA II. Shortly thereafter, the sunken bow of the MISSION was marked by Buoy WR2A, and the still floating stern section by WR3D, a quick-flashing green light located on the starboard quarter of the stern's boat deck some 30 ft. inboard of the stern. Buoy WR2A and the flashing green light WR3D, clearly and plainly marked the wreck of the MISSION insofar as concerns the literal language of the Wreck Act, 33 U.S.C. § 409.

3. As a result of the collision on March 7, 1957, between the MISSION and the SS ELNA II, the stern section of the wrecked MISSION floated in the western (downbound) half of Deepwater Point Range Channel, 80 feet from the center line of the channel and 1900 to 2000 feet above the intersection of the Bulkhead Bar Range and Deepwater Point Lights. The stern was firmly attached to the remainder of the ship by shell plating and three keelsons running fore and aft.

4. On the night of May 27th about 10:00 P.M., the SS COSMIC bound upriver collided with the floating stern sec-

Wilson & Lynam, Wilmington, Del., and Hill, Betts, Yamaoka, Freehill & Longcope, New York City, for libellant.

Alexander Greenfeld, U. S. Atty., Wilmington, Del., Harold G. Wilson and Bertram E. Snyder, Dept of Justice, Washington, D. C., of counsel, for respondent.

LAYTON, District Judge.

On the night of May 27, 1957, the SS COSMIC bound upriver collided with the floating stern section of the wreck of the SS MISSION SAN FRANCISCO (hereafter MISSION) lying about 80 ft. west

tion of the MISSION. It was a dark, very clear night with five mile visibility.

5. All pilots and ship operators knew or were required to know the exact location of the MISSION and of light WR3D and other navigational markers because they had been in place nearly 80 days and their positions were widely disseminated in Notices to Mariners issued by the Hydrographic Office, the Coast Guard and the Corps of Engineers. In addition, the President of the Delaware Bay and River Pilots Association participated in a meeting where all phases of marking and navigation in the area of the MISSION were thoroughly discussed. The wreck was marked with appropriate buoys and lights in accordance with the recommendations made at this meeting. Any superficial discrepancy between the recommendations for marking the wreck made at the meeting and the markings actually made by the Coast Guard were probably due to an error in the recommendations improperly inferring that the light WR3D was originally a buoy.

6. The COSMIC was making its third voyage to Philadelphia past the MISSION's stern in a deep draft condition during May 1957. She was ladened with 44,433 tons of iron ore and had a draft of 37 feet.

7. In bringing the vessel up New Castle Range, the engine was on full maneuvering speed under which power the COSMIC would have been making about 14 knots over the ground. Just before reaching Buoy 2B, engine speed was cut to half speed ahead.

8. New Castle and Deepwater Ranges are both 800 feet wide, but to facilitate the turns into and out of Bulkhead Bar, that range widens to 1600 feet, beginning to widen at a point 300 feet below Buoy 2B.

9. Buoy 2B was the first buoy warning navigators of the approaching 34° turn to the right from New Castle Range to Bulkhead Bar Range. Bulkhead Bar Range is only .65 miles long, and another identical 34° turn to the right from Bulk-

head Bar to Deepwater Point Range was required almost immediately.

10. Buoy 2B, quick-flashing red, 30 candlepower, marked the eastern (upbound) side of the channel. It was not contested at trial that lighted aids to navigation in the area were burning normally, with the possible exception of the light (WR3D) on the stern of the MISSION.

11. In addition to Buoy 2B, the lights marking the main Bulkhead Bar Range Channel as seen by a ship sailing upriver, were as follows:

(a) Buoy 1B flashing green, 30 candlepower light, 300 ft. to the west of Bulkhead Bar Range.

(b) Bulkhead Bar Range lights, white, 200,000 candlepower, which indicated the centerline of Bulkhead Bar Channel.

(c) Buoy 4B, quick-flashing red, 30 candlepower, marked the eastern limit and the next 34° change in channel direction to the right.

(d) Directly east of 4B on a fixed shore structure 30 feet high is Finns Point Jetty Light. This is a flashing white light of 400 candlepower, casting a 90 candlepower red sector over the entire length of Bulkhead Bar Range. It additionally warned of the 34° change in channel direction to the right into Deepwater Point Range.

(e) Deepwater Point Range Lights, white 250,000 candlepower, marked the centerline of Deepwater Point Range Channel.

(f) Directly east of the MISSION's stern, marking the eastern edge of Deepwater Point Channel, was Deepwater Point Buoy 2D, flashing red, 30 candlepower.

All the above range lights and buoys, located on Bulkhead Bar and Deepwater Point Channels, defined the 40-foot dredged channel to be used in passing the MISSION's stern.

12. Pilot MacIntire had piloted this river and these ranges for 37 years. He

had an intimate personal knowledge of the location of the wreck and the lights and buoys marking it. He had piloted approximately 50 ships of all kinds past the wreck of the MISSION prior to May 27th, including 14 deep draft ships. He had piloted at least two deep draft ships by the MISSION's stern at night. On May 14, he piloted a 35 ft. draft ship past the MISSION's stern. On May 21st, 6 days before this accident, he had piloted a 28 ft. draft ship past the MISSION's stern at night.

13. Any experienced pilot should have been able to pilot the COSMIC past the stern of the MISSION northbound on a clear night even if the green light on MISSION's stern had been out entirely.

14. MacIntire ordered a 10° swing just as the bow was approaching Buoy 4B. This was too late to make the turn into Deepwater Point Range without crossing over to the west side of the channel.

15. The normal brilliance of WR3D was approximately 28–30 candlepower and as such was clearly sufficient in the light of all other navigational aids.

16. The green light on the MISSION's stern was not out on the night of May 27, 1957. While it was not as bright as some of the navigational buoy lights, nevertheless, at the time of the accident, it was shining substantially at its normal brilliance, was otherwise unobstructed and was plainly visible well down New Castle Range long before its use for navigational purposes was necessary.

17. It is the duty of mariners, including, of course, pilots, promptly to report to the Coast Guard all manner of defects in navigational buoys and lights. Pilots had taken ships by the east channel past the MISSION's stern on hundreds of occasions before this accident and not once had ever complained to the Coast Guard that the green light, WR3D, was too dim or placed too far inboard of MISSION's stern or was obstructed by some portion of the MISSION's deck or gear.

18. There was no causal connection between the degree of brightness of this green light and the collision.

19. There was no causal connection between the location of WR3D on MISSION's stern section and this collision.

20. The preponderance of the evidence establishes that the COSMIC's smooth deck log was altered by a person or persons unknown. Each of the ship's officers called by libellant denied his responsibility therefor. The original log entry stated that the collision was due to poor maneuvering of the pilot, but was later erased and changed to place responsibility upon the alleged inadequacy of light WR3D.

21. WR3D, the green light, on MISSION's stern was operated on batteries of 12 volts. The force of the collision tore the MISSION's stern loose from the bow and among other things overturned a number of the batteries just referred to and scattered them over the steel deck.

22. Approximately six hours after the collision, these batteries showed a voltage drop down to 7 volts. The voltage drop was caused by damage to the batteries as a result of the collision.

23. In view of the narrowness of the channel caused by the wreck of the MISSION, there was good reason to place WR3D on the stern of the MISSION rather than on a floating buoy east of her stern.

## CONCLUSIONS OF LAW

1. The manner in which the wreck of the MISSION was marked complied in every respect with the provisions of the Wreck Act, T. 33 U.S.C.A. § 409.

2. The manner in which the wreck of the MISSION was marked did not violate any statute or regulation having the force of law.

3. Sec. 5–6–20 A and B contained in the Aids to Navigation Manual promulgated by the United States Coast Guard represents an interdepartmental rule for the guidance of Coast Guard personnel.

4. Under the provisions of 62.25–40 of the Code of Federal Regulations, the Coast Guard was vested with discretion in a proper case to omit the placing of a buoy on the channel side of a wreck.

5. The Coast Guard was in the exercise of good judgment in not placing a lighted buoy easterly of MISSION's stern.

6. In view of all other existing aids to navigation detailed in Finding of Fact (11), it was not negligence to place WR3D high on the stern section of the MISSION 30 ft. inboard of the extreme end of the stern.

7. There was no causal connection between the placing of WR3D 30 ft. inboard on the stern of the MISSION and the collision.

8. The Pennsylvania Rule is not applicable to the facts of this case.

9. The respondent was guilty of no negligence in the marking of the wreck of the MISSION.

10. The collision between the COSMIC and the wreck of the MISSION was caused solely by a faulty rudder or navigational error, or both.

11. The United States is not liable.

Libellant has advanced three main contentions why respondent improperly marked the wreck. First, it argues that the light WR3D was so dim or otherwise obstructed that ships coming upriver could not see it in time to estimate their positions properly and to make proper turning maneuvers, and that this was in violation of the Wreck Act, T. 33 U.S.C.A. § 409. Secondly, it is argued that the failure to mark the stern of the wreck by a lighted buoy placed in the channel easterly of the MISSION's stern violated 33 Code of Federal Regulations § 62.25–40. Thirdly, it is said that the light WR3D should have been placed at the extreme outside of MISSION's stern in accordance with Sec. 5–6–20 A and B of the Aids to Navigation Manual promulgated by the U. S. Coast Guard.

Libellant takes the position that a violation of the cited Act or Regulations would call for the application of the Pennsylvania Rule and regardless of the degree of negligence on its part, the rule of divided damages would apply.

Finally, libellant argues that, aside from the Pennsylvania Rule, respondent was guilty of negligence in the marking of the wreck and that even if it were also negligent, the rule of divided damages must apply.

■ As to the first proposition, the Wreck Act, insofar as pertinent reads:

"And whenever a vessel * * * is wrecked and sunk in a navigable channel * * * it shall be the duty of the owner * * * to immediately mark it with a buoy or beacon during the day and a lighted lantern at night * * *."

Although respondent complied with the literal language of the Act by placing both a buoy off the bow and a light on the stern of the wreck, concededly, if the light had been out on the night in question or so dim as not to be visible at some reasonable distance, then it might well be argued that the provisions of the Act had been violated or that, in any event, respondent was guilty of some lesser degree of negligence not requiring the application of the Pennsylvania Rule. But Findings of Fact, especially number 16, flatly dispose of either argument.

■ As to the second contention, 33 C.F.R. § 62.25–40 reads:

"Buoys established by the Coast Guard to mark wrecks are generally placed on the seaward or channel side of the wreck and as near to the wreck as conditions will permit."

While this regulation has the force of law, it is not mandatory in character. Rather it is discretionary, and it is difficult to see how such a regulation could be violated except, perhaps, in showing that the Coast Guard, or wreck owner, abused its discretion, or used bad judgment, in determining that the general rule of placing buoys on the channel side of the wreck need not be observed in a given case. Assuming that the use of bad judgment would amount to a vio-

lation of the regulation calling into play the Pennsylvania Rule, or if not, then as the basis for a finding of negligence generally, did the decision of the Coast Guard in this case to omit placing a buoy in the channel to the east of the stern of the wreck amount to bad judgment?[1] The plan for marking the wreck of the MISSION was neither hasty nor ill-conceived. It was arrived at as the result of a meeting attended by a number of important and knowledgeable people including among others a number of Coast Guard officials, a Colonel of the U. S. Army Engineers and the President of the Delaware River Pilots Association. The navigational aids decided upon, in conjunction with already existing lights or buoys, are recited in Finding of Fact 11. Libellant failed to give any evidence as to why the failure to place a lighted buoy at MISSION's stern was bad judgment. In my view, the placing of the light WR3D high on MISSION's stern only 30 ft. inboard of the outer extremity of the stern, in lieu of a lighted buoy easterly of the stern, was in the exercise of good judgment. This is so because due to the wreck lying across most of the westerly half of the channel, the amount of channel left for deep draft navigation was very narrow. To narrow this channel even further by placing a buoy off MISSION's stern would have been unwise. Libellant's own pilot witness, Lowe, testified to this. Moreover, it is obvious that in so narrow a channel a vessel might collide with such a buoy and take it out entirely, leaving no night light marking the stern of the wreck to the obvious danger of river traffic. By marking MISSION's stern with WR3D, a pilot with the aid of range lights could safely steer a course straight between WR3D and Deepwater Point Buoy 2D marking the east edge of the channel directly astern of the MISSION.[2] Under the circumstances here, my opinion is that good judgment was used in not placing a buoy in the channel to the east of MISSION's stern. It results then that there was no violation of 62.25–40 or any negligence displayed in the manner of marking the channel at MISSION's stern.

This brings us to the third question whether in placing WR3D 30 ft. from MISSION's stern, instead of directly on the stern, there was a violation of Sec. 5–6–20 of the Aids to Navigation Manual of the U. S. Coast Guard which reads:

Location of Lateral Markings—

A. Markings shall be placed on the seaward or channelward side of the wreck as near to the wreck as possible, and shall be so located that a vessel may pass close aboard the marking with safety.

B. If necessary, in order to reduce any possibility of confusion, more than one aid shall be used.

It should be noted at once that this Regulation does not have the force of law. Preliminarily, it may be said that it is very difficult to arrive at its true meaning. It uses the words "markings", but if by "markings" is meant buoys, then the Section flatly conflicts with 62.25–40 above discussed, which does have the force of law. And if it means lights, then the use of the words "as near to the wreck as possible" indicates a light off, not on, the wreck. Conceivably, a wreck in shallow waters might be marked with a light mounted on a post or tripod off the bow or stern. But the

1. I omit from this discussion the fact that libellant has failed to point to any authority by way of statute or regulation requiring that such a buoy be a lighted buoy. Assuming the buoy need not be lighted, this whole argument becomes pointless because an unlighted buoy could not be seen at night when this accident happened.

2. Assuming, of course, he made his proper turns at Buoys 2B and 4B. Actually, by keeping his range lights slightly open, a pilot could safely pass MISSION's stern without the aid of WR3D because, in addition to Buoys 2B, 4B, Finns Jetty Light and Buoy 2D on the east edge of the channel, there were Buoys 1B and 1D on the westerly side of the channel. (Marshall, Record page 208).

stern of the MISSION was in 40 ft. of water which would preclude the idea of a fixed light at that point.

Moreover, not only does Sec. 5-6-20 not have the force of law but it seems to be a sort of interdepartmental regulation promulgated for the guidance of Coast Guard personnel. I say this because the preamble to the Manual reads:

> "This Manual is promulgated for the guidance of Coast Guard personnel concerned with aids to navigation duties."

█ And if it should be suggested that 5-6-20 seeks to establish some form of standard of care a violation of which would amount to negligence, but not of such a degree as to evoke the application of the Pennsylvania Rule, then I can only say that, in this case, conflicting as it does with the decision of the Coast Guard not to follow the normal practice of placing a buoy on the channel side of MISSION's stern, no negligence can be charged against respondent in not complying with this regulation. I dismiss Sec. 5-6-20 as having any relevance under the facts of this case.

█ There remains the contention that aside from 5-6-20 it was negligence not to place WR3D on the extreme stern of the MISSION. Libellant made no effort to show that this omission failed to meet some known standard of care. True, two pilots stated that WR3D should have been placed there but gave no reason therefor; nor did they testify the collision would not have happened had WR3D been fixed to the outside of the stern. It seems to me that the standard of care should be that WR3D be placed on MISSION's stern at a point where it, in conjunction with all other known aids to navigation would permit a normal pilot to have taken a deep draft ship by this wreck in safety. In order to have been useful as a navigational aid, WR3D had to be visible for at least the length of Bulkhead Bar Range, or for

about a mile south of the MISSION. But to say that from a distance of one mile or even one half mile the placing of WR3D 30 ft. further east on MISSION's stern would have aided an upbound vessel in estimating its position and properly maneuvering at buoys 2B and 4B is straining at a gnat.[3] Hundreds of ships were navigated up and down river past this wreck without incident. Not a single complaint was received from any pilot from the day WR3D was located until the collision to the effect that the light was badly placed, or too dim. I find no negligence in the placing of this light where it was.

There are three significant factors in this case which should always be remembered in considering the effect of the Wreck Act, the regulations and the position of WR3D on MISSION's stern. First, at the Coast Guard hearing immediately after this collision when Pilot MacIntire's memory was fresh, he never once referred to WR3D as a contributory cause. Secondly, all libellant's contentions, except the alleged dimness of WR3D, are completely inconsistent with Pilot MacIntire's testimony. He was in charge of the helm and knew more about how this accident happened than anyone else. Never once at the Coast Guard hearing or at this trial did he testify that the position of WR3D or the presence or lack of presence of lighted buoys in any way contributed to this accident. He said the helm did not seem to answer too well at Buoy 4B [4] and that if the light WR3D had been brighter, had he seen it earlier, he might have avoided the collision. But Finding of Fact 16 precludes further argument as to the degree of brilliance of WR3D and if the helm was out of order, as it may have been, this was not the fault of respondent. Thirdly, after this collision the log of the COSMIC, which read that the collision was due to poor navigation by the pilot, was plainly altered to place

---

3. Particularly in view of Finding of Fact 14, stating that the order of a 10° right rudder at Buoy 4B was hopelessly late.

4. "I thought she was swinging sluggish, slower than usual."

the blame for the collision on the dimness of WR3D.[5]

In conclusion, then, I cannot find that this is a case for the application of the Pennsylvania Rule. Indeed, I cannot find the respondent guilty of any negligence. If it were necessary, I would find that, even if respondent were guilty of some negligence, the manner in which COSMIC was handled or the faulty condition of her rudder or both, were so completely the cause of this collision as to preclude the application of the rule of divided damages.

This memorandum shall be deemed to supplement the Findings of Fact and Conclusions of Law above set forth.

---

5. I wish to state here emphatically that no blame for this can attach to any person in the Pilot Association. Someone having access to, and custody of, the log and who had an excellent knowledge of Greek must have been responsible.