DFDS SEACRUISES (BAHAMAS) LTD. and Assurance–Compagniet Baltica, Aktieselskab, Plaintiffs,

v.

UNITED STATES of America, Cape Canaveral Volunteer Fire Department and Merritt Island Volunteer Fire Department, Defendants,

v.

SCANDINAVIAN WORLD CRUISES (BAHAMAS) LTD., Third–Party Defendant.

No. 86–0481–CIV.

United States District Court, S.D. Florida.

Dec. 21, 1987.

Nils Linfors, Jr., and Reginald M. Hayden, Jr., Hayden & Milliken, P.A., Miami, Fla., Richard G. Ashworth, Haight, Gard-

ner, Poor & Evans, New York City, for plaintiffs & third-party defendant.

Irving A. Pianin, Torts Branch, Civ. Div. U.S. Dept. of Justice, Washington, D.C., Leon B. Kellner, U.S. Atty's Office, Miami, Fla., for U.S.

Harold P. Bistline, Leon Stromire, P.A., Cocoa, Fla., David Bobbitt, Mottlau & Abel, Miami Fla., for Cape Canaveral Volunteer Fire Dept.

Eben G. Crawford & Thomas A. Dye, Squire, Sanders & Dempsey, Miami, Fla., for Merritt Island Volunteer Fire Dept.

## AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

NESBITT, District Judge.

This cause was heard before the Court without a jury. After due consideration of the evidence, and having examined the exhibits, pleadings, stipulations, and otherwise being duly advised in the premises, the Court pursuant to Rule 52(a) Federal Rules of Civil Procedure makes the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

*Background*

A little fire is quickly trodden out,

Which being suffered, rivers cannot quench.

King Henry VI, Part 3—Act iv, Scene viii.

On March 9, 1984, a fire was discovered aboard the cruise ship *Scandinavian Sea* shortly before 7:20 p.m. while the vessel was on a "cruise to nowhere" approximately nine miles southeast of Cape Canaveral, Florida, carrying 744 passengers and 202 crew-members. Subsequent investigation determined that the fire was deliberately set in a crewman's cabin, 414. When discovered, the fire was an extremely small circle of flame, but through a series of events [1] the fire spread outside of the cabin to a number of cabins and in and between the decks. The *Scandinavian Sea* reached port approximately one hour and forty minutes later. The evidence is disputed whether the fire was "under control" or not when it reached port.[2] For the next two days local, regional and federal agencies relentlessly fought the fire until it was extinguished. Fortunately, no lives were lost nor were any serious injuries sustained by passengers, crew, shoreside firefighters or Coast Guard personnel. The fire was confined to the ship's forward fire zone, saving most of the ship from burning.

DFDS Seacruises (Bahamas) Ltd. and Assurance–Compagniet Baltica, Aktiesekskab (Plaintiffs), the owners and underwriters of the *Scandinavian Sea*, filed a complaint in admiralty alleging negligent firefighting against the Defendants, two volunteer fire departments, the United States Coast Guard (Coast Guard), and Cape Canaveral Volunteer Fire Department (CCVFD) and Merritt Island Volunteer Fire Department (MIVFD) [3]. The Plaintiffs further alleged that the United States is liable for failing to establish a shipboard firefighting contingency plan. Defendants denied the allegations of negligence and filed counterclaims for salvage awards. The United States also filed a Third–Party Complaint against Scandinavian World Cruises (Bahamas) Ltd., the operator of the vessel, for contribution and indemnity and for salvage. The United States has contended that the Court lacks jurisdiction over the contingency planning issue.

Based upon the requests of all parties, the trial proceeded as to liability only. The

---

**1.** These events were acts, conduct and omissions by the ship's crew which are described in more detail *infra* pages 1196–1197.

**2.** This is a critical fact. The Plaintiff contends the fire was "under control" and the Coast Guard and/or Cape Canaveral Volunteer Fire Department by their negligent actions rekindled the fire. The Defendants United States of America and Cape Canaveral Volunteer Fire Department, on the other hand, contend the fire was not "under control" when it reached port and the Coast Guard and Cape Canaveral Volunteer Fire Department took over.

**3.** All claims and cross-claims by and against MIVFD were voluntarily dismissed by the parties.

issue of damages was reserved pending the outcome of the liability issues.

### The Fire Before Docking

On March 9, 1984, the *Scandinavian Sea*[4] departed from Port Canaveral with 744 passengers and 202 crewmembers aboard, proceeded approximately nine miles offshore, anchored and carried out its normal activities. The ship's officers consisted of a Master, Chief Officer, First Officer, Radio Officer, Chief Engineer and eight engineers. Although the ship's emergency plan required a Second Officer, to save costs the ship was operating with a reduced complement of officers.

At approximately 7:15 p.m. while passing through the "A" deck area, the ship's plumber, Foilan Burgos (Burgos) saw smoke issuing from around the edges of the closed door of cabin 414. Cabin 414 is located on "A" deck forward at frame 170.[5] When Burgos and a ship's bar waiter unlocked the door they observed a very small circle of flame on the carpet. The fire was described by the plumber as only about one foot in diameter at that time. Subsequent investigation determined that the fire had been deliberately set.

Of the 202 crewmembers on board the *Scandinavian Sea,* nine were predesignated to make up the ship's firefighting party. Burgos was one of the ship's firefighters.

Manual fire alarms were located in the immediate vicinity of cabin 414. Burgos could not locate a nearby alarm, but instead, he descended to the "B" deck and used a telephone some 100 feet away to notify the bridge. At 7:20 p.m. Burgos advised the Master, Chief Officer and Radio Officer, who were on the bridge of the smoke on "A" deck.

Just seconds later, the ship's automatic fire detection panel on the bridge activated, indicating a source of heat on the "A" deck forward. At this point the ship's Master, Leo Kjeldsen, deactivated the alarm which would have sounded thirty seconds later by automatic relay in the crew's quarters. The Master sent the Chief Officer, Anders Pedersen, to investigate.

Following his notification to the bridge, Burgos returned to cabin 414 on "A" deck and attempted to extinguish the fire with a portable water extinguisher, but he found the extinguisher virtually without pressure. Burgos and another crewman who was in the area then moved aft and waited. A readily available and pressurized fire hose located in a conspicuously marked fire station locker some four feet from cabin 414 was not utilized.

Meanwhile, the Chief Officer arrived on "A" deck, saw the smoke and radioed the bridge to raise the alarm to the crew. The alarm was raised several minutes after Burgos had called the bridge. The Chief Officer, who was second in command under the Master, then had the plumber don an oxygen breathing apparatus ("OBA") and sent him into the fire area alone with a small dry powder extinguisher.

Burgos returned to cabin 414 and found that the fire had spread and the heat and smoke production had intensified. He discharged the powder extinguisher but observed little effect on the fire; he left the extinguisher in the doorway which prevented the door from closing. Burgos' failure to close the cabin door permitted the quickly growing fire to spread outside the cabin.

---

4. It was undisputed that DFDS Seacruises (Bahamas) Ltd., a Bahamian corporation, was the registered owner of the *Scandinavian Sea* at all material times, and Scandinavian World Cruises (Bahamas) Ltd., was the operator of the *Scandinavian Sea* at all material times.

   The *Scandinavian Sea* was a cruise ship built in 1970 and was 490 feet long, 65 feet in breadth and 20 feet in depth. She consisted of nine decks which, ascending from her lowest deck, were designated "C" deck, "B" deck, and "A" deck, followed by other traditional boat decks (lounge, observation, etc.).

   The *Scandinavian Sea*'s normal operations involved day cruises out of Port Canaveral, Florida. The ship was capable of carrying 1237 persons.

5. Reference to specific areas is made by deck name and frame number. Frame 1 is at the aft of the ship and frame 200 is at the bow. Frames are approximately 2.5 feet apart. The pertinent frames are appended to this opinion as a composite exhibit (Appendix 1).

This factor, among others, turned a situation which should have been quelled into an extremely serious and difficult emergency.[6]

For the next hour the ship's fire parties unsuccessfully attempted to fight the fire. They made several attacks from aft of frame 153 and also an attack down a forward stairwell leading from main deck to "A" deck at frame 179. Each time the crew entered with hoses forward of the fire door at frame 153, they experienced overwhelming heat and smoke. This intense heat also confronted the crew as they fought the fire by descending through the forward stairwell. The crew was further hindered by inadequate or poorly maintained equipment each time they descended the forward stairwell. For example, a nozzle broke off a hose and the steel handle on the door broke.[7]

During this period ship's firefighters were exhausting the available OBA canisters. At some point well before docking, the crew's air supply was exhausted and firefighting in the "A" deck forward of frame 153 was suspended. The crew was also hampered in its firefighting efforts by the fact that a number of air bottles aboard were incompletely filled; a broken air compressor prevented the crew from recharging their OBA's.

Meanwhile, at approximately 6.5 miles out to sea, passengers were evacuated from the cabins to open decks. As the cabins on main and upper decks were evacuated, some of the cabin doors were left open.

At approximately 7:40, the Master advised the U.S. Coast Guard Station at Cape Canaveral that there was a fire aboard on a "lower deck, believed under control, 6 miles out." The Master requested that the Coast Guard have the shoreside fire department

(not the Coast Guard) meet the ship at the dock upon arrival.

Coast Guard Station Cape Canaveral is a small unit within United States Coast Guard Group Mayport, Florida. Its station missions include search and rescue, law enforcement, aids to navigation and reserve training. By 7:43 p.m., the station had a patrol boat underway to provide escort to the *Scandinavian Sea*. At approximately 7:50 p.m., the CCVFD was notified and within minutes had two trucks enroute to the port terminal to await the ship's arrival.

At approximately 8:26 p.m., the ship repeated its request for the shoreside fire department and reported that it was trying to contain the fire, was having problems with smoke, and that all passengers had been evacuated to open decks. At 8:57 p.m. the *Scandinavian Sea* berthed the power. As she approached the pier smoke could be seen billowing from the area of the vertical door of the upper deck.

### The Fire After Docking

The ship's Chief Officer greeted the CCVFD members who boarded as soon as the ship arrived. The Chief Officer described the fire to the boarding firefighters as "out of control" and directed the CCVFD Chief and its firefighters to the "A" deck forward. CCVFD found the fire door at frame 153 wide open with ship's hoses running from aft of the door into the fire area. Some CCVFD members experienced severe heat and smoke upon entering the area and found fires in at least three cabins.

During the initial period CCVFD decided to use their own hoses from shore. This decision was based in part upon the dangers and delays associated with the rupturing and faulty ship's hoses. CCVFD mem-

---

6. The evidence revealed a number of factors attributable to the ship. First, the crew's firefighting training was inadequate and the crew failed to comply with some of the critical firefighting procedures they had been taught. Second, the ship's firefighting equipment, including its fire hoses, was maintained in poor working order. Third, an opening was left in the ceiling over "A" deck forward of frame 165 which facilitated the fire traveling into the overhead space

and spreading to the decks above. Fourth, the *Scandinavian Sea* was constructed with a high degree of combustible materials, especially in the accommodation spaces which provided an excessive fuel load for the fire.

7. The firefighting activities occurred in such a manner as to be reminiscent of the antics of the Keystone Cops.

bers were only able to stay in the fire area for ten to fifteen minute intervals before having to retreat aft and up to the main deck to replace their air canisters.

Due to the extraordinary heat in the steel alleyway, especially in the hidden overhead spaces, CCVFD decided to ventilate the "A" deck in order to remove the hot gases and smoke and thereby to enable themselves to remain on the "A" deck forward area for greater periods of time.

Based upon their training and experience, and the heat and smoke conditions in "A" deck, CCVFD opened doors and placed two small smoke ejectors aboard the ship to facilitate removal of the heat and smoke.

The Chief of the MIVFD arrived shortly after the ship berthed and responded to CCVFD's request for backup personnel and equipment. Minutes later the Brevard County Fire Control Battalion Chief boarded and went to the bridge to assist with logistics and coordination.

At approximately 9:10 p.m. EST, two Coast Guard station members and a rescue and assistance ("R & A") team sent from the USCG Cutter *Diligence* boarded the vessel, and were met by the station's chief petty officer ("CPO"), David Hawthorne, minutes later on the car deck. By this time CCVFD was actively fighting the fire and ventilating the "A" deck.

Approximately five minutes later an Ensign from the USCG Cutter *Diligence*, Robert Pyle, arrived and led the R & A team forward on the main deck. During the period between approximately 9:30–10:30 p.m., while Ensign Pyle and his team were cooling the main deck and investigating other decks for evidence of fire or heat, the team extinguished a fire which broke out behind them on main deck. Although CCVFD managed to extinguish visible fires in various cabins and to reduce the smoke on "A" deck through ventilation, it continued to experience intense heat from the hidden overhead spaces. The water applied through piercing nozzles placed through the "A" deck ceiling turned to steam and did not reduce the heat. Meanwhile, Ensign Pyle and his team observed that cool-

ing water applied to the carpet of the main deck above also turned to steam.

CPO Hawthorne recommended to CCVFD that ventilating a shipboard fire was, based on his training, not the best method to fight the fire. The CCVFD disagreed and continued to ventilate. Ensign Pyle and his team deferred to the shoreside firefighters and continued to cool the main deck.

At approximately 10:30 p.m. EST the Commanding Officer of the USCG Cutter *Diligence* ("C.O."), Arthur Sheppard, a Commander with twenty-three years experience, and his Engineer Officer ("E.O."), Eric Nicolaus, both of whom had relatively extensive marine firefighting training, arrived on the scene. Thereafter, the C.O. and E.O. met the Chief Officer and went to the bridge to speak to the Master. On the way the C.O. and E.O. observed and were concerned by electrical power still functioning in the area of the active firefighting on "A" deck.

Following a brief survey of the situation the C.O. and E.O. reached the bridge and discussed securing both power and ventilation with the Master. The Master agreed that the power should be secured for safety reasons and that ventilating should be stopped.

At about 11:20 p.m. the C.O. and E.O. arrived back on the car deck and met with the Chief of CCVFD. The C.O. recommended changing tactics by securing ventilation, removing the fans and buttoning up the fire area in order to plan a further attack, as he believed ventilating was an inappropriate method of fighting a ship fire. The Chief of CCVFD disagreed, and after a discussion relinquished control over the firefighting efforts stating, "okay it's your fire." At this point the Coast Guard undertook the role to supervise the Coast Guard and shoreside firefighting efforts.

It was agreed that a three-deck attack would be attempted: CCVFD on "A" deck, Coast Guard on main deck, and MIVFD on upper deck. During these efforts numerous ship's hoses ruptured, and ship crewmembers not involved in firefighting kept going in and out of the forward section to

retrieve personal belongings, often leaving doors open behind them. Conditions worsened considerably and on March 10, C.O. Sheppard requested and the Master agreed to remove all nonessential crewmembers from the ship to preclude injuries and to eliminate their interference in the firefighting efforts.

During the next one and a half days some forty agencies or organizations and hundreds of firefighters fought the fire. Despite the massive outpouring of assistance and equipment, the rapidly spreading fire moved upward through the decks. At times the situation seemed to improve only to become worse later on. Strike Teams from Mississippi and North Carolina were flown in to assist. Pollution booms were set around the ship to prevent the potential for environmental disaster. Fuel tanks were foamed to preclude explosion. The Coast Guard Captain of the Port established safe parameters regarding the vessel's list to starboard and evacuated the ship periodically until enough water was removed and the list reduced to acceptable levels. The Master of the ship was consulted and agreed to each tactical decision.

The fire was declared out at 4:00 p.m. on March 11. Approximately ninety firefighters were treated for smoke inhalation and several were hospitalized temporarily. Some weeks later Plaintiffs and other representatives of the vessel joined in a ceremony to recognize and commend the actions and efforts of the Coast Guard and firefighters in assisting the ship. Numerous commendations were given by the United States Secretary of Transportation, Coast Guard and the Port Authority to Coast Guard personnel and firefighters for efforts deemed heroic and outstanding.

## CONCLUSIONS OF LAW

The Court has made numerous findings of fact concerning the events surrounding the fire aboard the *Scandinavian Sea* on March 9–11, 1984. To the extent that these findings also constitute legal conclusions they are incorporated herein. The Court addresses Plaintiffs' allegations of negligence *seriatim* as to each of the parties.

Defendants' salvage claims are addressed separately.

### I. *Jurisdiction*

#### A. The United States

■ In the instant case, Plaintiffs have sued the United States in admiralty pursuant to the Suits in Admiralty Act ("SAA"), 46 U.S.C. § 741 *et seq.* The SAA, which constitutes a waiver of sovereign immunity by the United States for certain claims, generally allows suit to proceed against the United States where suit could lie against a private person under the same circumstances. 46 U.S.C. §§ 742, 743; *Canadian Aviator, Ltd. v. United States,* 324 U.S. 215, 65 S.Ct. 639, 89 L.Ed. 901 (1945). As to Defendant United States the Court has jurisdiction over Counts I and II in the Complaint pursuant to the SAA. Because the Court concludes that Count III in the Complaint is based upon an unreviewable discretionary function, the Court lacks jurisdiction over the claim therein.

#### B. Volunteer Fire Department

■ The Court has jurisdiction over Defendant CCVFD in admiralty, pursuant to 28 U.S.C. § 1333. The Court notes that CCVFD asserts state sovereign immunity as a basis to limit judgment on Plaintiffs' claim. It is not applicable, however, to limit the cross-claim filed by the United States against CCVFD. The 11th Amendment does not preclude suit against a state by the United States. *United States v. Mississippi,* 380 U.S. 128, 140–41, 85 S.Ct. 808, 814–15, 13 L.Ed.2d 717 (1965); *United States v. Louisiana,* 339 U.S. 699, 701–02, 70 S.Ct. 914, 915, 94 L.Ed. 1216 (1950); *United States v. California,* 328 F.2d 729 (9th Cir.1964). The doctrine of sovereign immunity in tort does not preclude the federal district courts from adjudicating a suit by the United States against a state. *United States v. California,* 328 F.2d 729. The federal courts may entertain suits by the United States against a state without consent of the state. *United States v. Mississippi,* 380 U.S. at 140–41, 85 S.Ct. at 814–15. *See, e.g., United States v. Arizona,* 214 F.2d 389, 394 (9th Cir.1954).

## II. Claims Relating to Negligent Firefighting and Supervision (Counts I and II)

### A. Negligent Firefighting

Plaintiffs' first claim for relief alleges that Defendants engaged in negligent firefighting tactics and practices aboard the *Scandinavian Sea.* To prevail against Defendants under either theory, Plaintiffs must prove all elements of a tort action, including duty, breach, causation and damages. *See, e.g., Bridgford v. United States,* 550 F.2d 978, 982 (4th Cir.1977); *Mazzullo v. United States,* 1980 A.M.C. 1038 (D.D.C.1979).

Regarding the first element of duty, under the SAA, a party has no greater claim in admiralty against the United States than he would have against a private person under similar circumstances. 46 U.S.C. § 742, 743; *Canadian Aviator, Ltd. v. United States,* 324 U.S. 215, 65 S.Ct. 639, 89 L.Ed. 901 (1945).

■ Under both common law and admiralty law, a private party has no affirmative duty to rescue or salvage a vessel in distress. *See Basic Boats, Inc. v. United States,* 352 F.Supp. 44, 48 (E.D.Va.1972); *Lacey v. United States,* 98 F.Supp. 219, 220 (D.Mass.1951); W. Prosser, *Law of Torts* 41 (4th ed. 1971); *Restatement (Second) of Torts* § 281 (1965); *Frank v. United States,* 250 F.2d 178, 180 (3d Cir.1957). Moreover, as noted by the Florida Supreme Court, there has never been a common law duty to provide firefighting services. *City of Daytona Beach v. Palmer,* 469 So.2d 121 (Fla.1985) and cases cited therein.

■ Contrary to the popular opinion that the Coast Guard has a duty to render rescue aid to vessels or persons on the high seas, the Coast Guard does not have a mandatory duty to provide rescue or salvage services, but *may* "render aid to persons and protect and save property at any time and at any place" where personnel are available. 14 U.S.C. § 88. It is well-settled that the Coast Guard's authority to

provide such assistance is purely voluntary and permissive. *In Re American Oil Company,* 417 F.2d 164 (5th Cir.1969).[8] *See, e.g., Kelly v. United States,* 531 F.2d 1144, 1147 (2d Cir.1976); *Wellington Transportation Company v. United States,* 481 F.2d 108, 110 (6th Cir.1973); *United States v. Sandra & Dennis Fishing Corp.,* 372 F.2d 189, 195 (1st Cir.1967); *United States v. DeVane,* 306 F.2d 182, 186 (5th Cir.1962). Specifically, the Coast Guard owed no duty to render fire fighting services to any ship, including the *Scandinavian Sea. In re American Oil Company,* 417 F.2d 164.

Notwithstanding the absence of a pre-existing duty to provide rescue or firefighting services, the Coast Guard is held to the same standard of care as a private person for any voluntary undertaking it assumes. Thus, the nature of the Coast Guard's voluntary undertaking must be examined to determine the aplicable standard of care. At the emergency request of the *Scandinavian Sea* the Coast Guard advised the fire department and sheriff's office of the fire and sent one of its boats to escort the ship to port. Coast Guard personnel from the local station and from the Cutter *Diligence* voluntarily assisted the imperiled ship. Later, when the local fire chief relinquished control, the Coast Guard was placed in a position of overall supervision for the massive multiorganizational operation. For the next two days the Coast Guard, among others, fought to contain the fire.

The Supreme Court long ago recognized that attempting to save a ship from the danger of destruction by fire is a salvage service. *The Connemara,* 108 U.S. 352, 2 S.Ct. 754, 27 L.Ed. 751 (1883). In commenting on such salvage services the Fifth Circuit stated that "A non-friendly fire aboardship so long as it remains unextinguished is a classic example of marine peril." *Legnos v. M/V Olga Jacob,* 498 F.2d 666, 670 (5th Cir.1974) (shipboard fire in Port Canaveral). Accordingly, the Coast

---

**8.** Under *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981), the decisions of the Fifth Circuit handed down on or before October 1, 1981 are binding precedent in the Eleventh Circuit.

Guard's actions to assist the ship from destruction by fire were salvage efforts which are to be reviewed by the standard of care owed by salvors. *In re American Oil,* 417 F.2d 164 (Coast Guard firefighting activities on ship are voluntary salvage efforts). *See, e.g., Basic Boats,* 352 F.Supp. 44; *DeVane,* 306 F.2d 182.

█ When a distressed vessel is damaged by the original peril to which it was exposed, as hereby the original fire, the salvor is liable for damages arising only from its gross negligence or wilful misconduct. *The Noah's Ark v. Bentley & Felton Corporation,* 292 F.2d 437, 440 (5th Cir. 1961). *See, e.g., Furka v. Great Lakes Dredge & Dock Co., Inc.,* 755 F.2d 1085, 1089 (4th Cir.1985); Gilmore and Black, *Law of Admiralty* § 8–7, pp. 554 *et seq.* (2d ed. 1975).

The law of admiralty encourages people to risk life and property to go to the rescue of mariners, and of "all the branches of jurisprudence, the admiralty must be the most hospitable to the impulses of man and law to save life and limb and property." *Grigsby v. Coastal Marine Service of Texas, Inc.,* 412 F.2d 1011, 1021 (5th Cir.1969), *cert. denied,* 396 U.S. 1033, 90 S.Ct. 612, 24 L.Ed.2d 531 (1970).

Plaintiffs' heavy burden of proof reflects the value society places upon salvage and rescues. *Furka,* 755 F.2d, at 1089. As noted recently by the Fourth Circuit:

> The best traditions of seafaring men demand that we honor attempts to rescue, unless the rescuer acts beyond the bounds that even the exigencies of the moment would allow. The wanton and reckless standard reflects the value society places upon rescue as much as any desire to avoid a total defeat of recovery under common law. *Law must encourage an environment where human instinct is not insular but responds to the plight of another in peril.*

*Id.* (emphasis added).

█ In the alternative, the Court has considered the Coast Guard's efforts under the good samaritan doctrine. *United States v. DeVane,* 306 F.2d 182 (5th Cir. 1962). *See, e.g., Berg v. Chevron U.S.A.,*

*Inc.,* 759 F.2d 1425 (9th Cir.1985). Under the good samaritan doctrine liability will not be imposed unless the would-be rescuer was negligent under the circumstances *and* his conduct worsened the position of the vessel in distress. *See, e.g., DeVane,* 306 F.2d 182; *Mazzullo,* 1980 A.M.C. 1038 (D.D.C.1979). Accordingly, the Coast Guard will be liable in fact under the circumstances of this case only if (1) it was grossly negligent or reckless in its attempt to save the *Scandinavian Sea,* or (2) it was negligent *and* worsened the position of the ship.

In applying this standard the Court should not second-guess difficult decisions made by rescue personnel in the midst of an emergency, but determine what a reasonable firefighter should have done when confronted with the scene of the fire. *See, e.g., Furka,* 755 F.2d 1085; *Johnson v. United States,* 378 F.2d 732 (9th Cir.1967).

> We are of the opinion that public policy dictates that the United States should not be liable for fault of the Coast Guard in the field of rescue operations.... The first [public policy rationale] may be directed to the inevitable consequence on the morale and effectiveness of the Coast Guard if the conduct of its officers and personnel in the field of rescue operations under the indescribable strains, hazards and crises which attend them, is to be scrutinized, weighed in delicate balance and adjudicated by Monday–morning judicial quarterbacks functioning in an atmosphere of serenity and deliberation far from the maddening crowd of tensions, immediacy and compulsions which confront the doers and not the reviewers.

> \*　\*　\*　\*　\*　\*

> If men are to be brought to an abrupt halt in the midst of crises—to think first that if they err in their preformance they may expose their Government to financial loss and themselves to disciplinary measures or loss of existing status, and then to pause and deliberate and weigh the chances of success or failure in alternate rescue procedures, the delay may

often prove fatal to the distressed who urgently require their immediate aid. *P. Dougherty Co. v. United States,* 207 F.2d 626, 634 (3d Cir.1953).

■ When the law is applied to the facts of this case, it is clear that efforts of the Coast Guard were far from negligent, and certainly not grossly negligent. The *Scandinavian Sea* was in an emergency situation with a fire in her accommodation spaces. "Of all fires, a fire at sea is potentially the most hazardous in terms of human life." [9]

The Court finds that applying to the facts that the efforts of the Coast Guard were far from negligent and certainly not grossly negligent.

### To Ventilate or Not to Ventilate

The negligent firefighting claims against the Coast Guard and CCVFD are bottomed on the initial decision by CCVFD to ventilate the fire and by the failure of the Coast Guard to take any action to cease the ventilation efforts, thus "wrongly encouraging the CCVFD in its improper tactics."

Ventilation is a firefighting tactic often used to combat structure fires on land and fires on ships. The fire experts agreed that there are two recognized schools of thought respecting ventilating shipboard fires. One school advocates ventilation, the other counsels against it. Each expert noted, however, that ventilation is strongly advocated by some of the foremost shipboard fire experts in the world. Although Plaintiffs' expert felt ventilation was inadvisable, he acknowledged that he knew of no case in which merely "sealing up" was successful in extinguishing a passenger ship fire. Due to the number of natural passageways and inlets in passenger ships, and the great volume of ambient air, it is impossible to suffocate a passenger ship

fire. For this reason, among others, the experts were in total agreement that passenger ship fires are among the most difficult fires in the world to extinguish and decisions as to ventilate or not must be made quickly and under most difficult circumstances.

At most, CCVFD's decision to ventilate was inappropriate only in retrospect, as it is not totally contra-indicated as an acceptable method of firefighting. In any event, the evidence failed to demonstrate that any member of the Coast Guard firefighting team ventilated the fire. To the contrary, the overwhelming evidence demonstrated that the Coast Guard personnel on scene were against ventilating the forward part of the ship. Plaintiffs' contention that the Coast Guard should have ordered the fire department to change its tactics is unreasonable under the emergency situation present at the time CCVFD was attempting to fight the fire. Accordingly, the Court finds Plaintiffs' claim for negligent firefighting against the Coast Guard and CCVFD must fail.

### B. Negligent Supervision

Plaintiffs also failed to demonstrate any negligent supervision. As to this claim, it is the Plaintiff's position that the United States should be liable in fact for failure of the Coast Guard to take charge and direct the CCVFD firefighting methods.[10]

Plaintiff relies on the failure of the Coast Guard to properly supervise the firefighting efforts as being contrary to their own standards. In support of this theory, Plaintiff introduced the Coast Guard Marine Safety Manual[11] which provides that when supervision of firefighting falls to the Coast Guard, the Coast Guard Captain designated as the scene coordinator has responsibility for the effective utilization of

---

**9.** F. Rushbrook, *Fire Aboard: The Problems of Prevention and Control in Ships, Port Installations and Offshore Structures,* 17 (2d ed. 1979).

**10.** In more detail, the Plaintiff claims

These Coast Guard officers were negligent in failing to take charge of the firefighting, in failing to direct that proper methods of fighting a shipboard fire be followed, and in fail-

ing to insure that the untrained and inexperienced local firefighters did not undo the efforts successfully undertaken by the ship's crew to contain and control the fire.

**11.** Dep't of Transportation, *United States Coast Guard Marine Safety Manual* 86–6–15 (Plaintiff's exhibit 15) [hereinafter *Marine Safety Manual*].

all personnel and equipment in fighting marine fires.

The Coast Guard did assume supervision after a matter of hours. In the meantime the Coast Guard had done what the ship's Master had requested of it: to have the shoreside fire department, not the Coast Guard, meet the vessel. Other evidence of the tremendous resources which were obtained, the numerous firefighters flown in and the multi-organizational efforts procured by the Coast Guard, demonstrated a massive well-organized and orchestrated effort. The Court finds Plaintiffs' claim for negligent supervision of firefighting also is without merit.

### III. *Claim Relating to Contingency Planning (Count III)*

Plaintiffs contend that the United States should be held liable for failing to have formulated plans for shipboard firefighting in Port Canaveral, Florida. Plaintiffs claim that had such plans been in existence, the interagency firefighting efforts would have been better coordinated and the results more effective.

Port Canaveral, Florida is a relatively small and remote port located on the Canaveral Peninsula, adjacent to the Kennedy Space Center complex. When the *Scandinavian Sea* began its operations from Port Canaveral in 1982 the ship had no information as to the emergency services in the small surrounding community. In light of the ship's responsibility for the safety of hundreds of passengers and crew, the Master at the time arranged a meeting on the ship with local authorities. The purpose of the meeting was to display the new ship and to discuss events such as a bomb threat, hurricane, fire, hijacking and robbery. The Master, representatives of CCVFD, Port Authority, Sheriff's Department and a Coast Guard member were present for the meeting which lasted about an hour during which the CCVFD discussed its ability to respond in event of a fire.

Subsequent to this meeting the *Scandinavian Sea* invited the CCVFD back aboard to tour the ship and discuss further the event of fire. No member of the local Coast Guard was invited to this follow-up meeting. Following these meetings, the *Scandinavian Sea* took no action to discuss firefighting arrangements with CCVFD or any other fire department or with the Port Authority or Coast Guard.

Plaintiffs also claimed that the Coast Guard negligently failed to prepare a detailed contingency plan consistent with the Coast Guard policy based on the Ports and Waterways Safety Act, 33 U.S.C. § 1221. Plaintiffs also base their claim upon a Coast Guard Marine Safety Manual, a ten volume internal operating manual series. At the time of the fire, Volume VI of the manual stated in pertinent part:

> District commanders, captains of the port and commanding officers of other units as directed by the district commanders, are required to insure that ports within their jurisdiction have current and effective contingency plans, supported by the port community, to provide adequate response of the available Federal, state, municipal and commercial resources to fires and other accidents.

*Marine Safety Manual,* at 86-6-5.

The uncontradicted testimony was that Manual is used for internal guidance only and sets forth numerous desirable goals which Coast Guard personnel are encouraged to achieve.

The Coast Guard's port safety mission is handled through roughly fifty Captain of the Port ("COTP") offices. A COTP has broad federal authority within a designated region. COTP's are given wide latitude and discretion in determining how best to use their resources to serve the entire panoply of maritime concerns. Each COTP is authorized to establish his office's own priorities and to determine the individual needs of ports within his jurisdiction.

The COTP whose region included Port Canaveral decided not to give the formulation of firefighting contingency plans in Port Canaveral high priority. In March 1984, seventy-seven ports as large or larger than Port Canaveral did not have Coast Guard–developed firefighting contingency plans. Even such major ports as New

York, Philadelphia, New Orleans, Houston, Seattle, Savannah, Charleston and Beaumont, to name just a few, did not have Coast Guard–promulgated firefighting contingency plans at that time.

The Court rejects Plaintiff's claim that the United States should have formulated a contingency plan for shipboard firefighting at Port Canaveral for the following reasons: (1) Government decisions as to whether to formulate particular contingency plans are a protected discretionary function. (2) The government owed no duty to Plaintiffs, statutory or otherwise, to formulate a firefighting contingency plan.

### Discretionary Function

■ The United States cannot be sued save as it consents to be sued. *Dalehite v. United States,* 346 U.S. 15, 30, 73 S.Ct. 956, 965, 97 L.Ed. 1427 (1953); *Larson v. Domestic and Foreign Commerce Corp.,* 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949).

For a damage suit to proceed against the United States there must be a clear statutory waiver of sovereign immunity and any such waiver must be strictly construed as it will define a court's subject matter jurisdiction. *United States v. Sherwood,* 312 U.S. 584, 61 S.Ct. 767, 85 L.Ed. 1058 (1941); *Hutchinson v. United States,* 677 F.2d 1322 (9th Cir.1982).

Plaintiffs bring their action against the United States pursuant to the SAA, which constitutes a waiver of sovereign immunity for certain admiralty claims against the United States. *Canadian Aviator, Ltd. v. United States,* 324 U.S. 215, 65 S.Ct. 639, 89 L.Ed. 901 (1945). Like the Federal Tort Claims Act, 28 U.S.C. § 2680(a), the SAA does not waive immunity from claims based upon the discretionary functions of federal agencies. *Williams v. United States,* 747 F.2d 700 (11th Cir.1984), *aff'g* 581 F.Supp. 847 (S.D.Ga.1983). *See Wiggins v. United States,* 799 F.2d 962 (5th Cir.1986).

Discretionary function immunity protects the government from "liability that would seriously handicap efficient government operations." *United States v. Muniz,* 374 U.S. 150, 163, 83 S.Ct. 1850, 1858, 10 L.Ed. 2d 805 (1963). Immunity for discretionary decision-making is intended "to prevent judicial 'second guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 814, 104 S.Ct. 2755, 2765, 81 L.Ed.2d 660 (1984).

The doctrine of immunity for discretionary functions was carefully examined in *Dalehite,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427, a case involving enormous claims for damages against the government resulting from a tragic gas explosion offshore in Texas. It has been described as "the discretion of the executive or the administrator to act according to one's judgment of the best course." In *Dalehite,* 346 U.S. at 34, 73 S.Ct. at 967, the Supreme Court stated that:

> It is unnecessary to define, apart from this case, precisely where discretion ends.... It also includes determinations made by executives or administrators in *establishing plans,* specifications or schedules of operations. *Where there is room for policy judgment and decision there is discretion.*

*Id.* at 35–36, 73 S.Ct. at 967–68 (footnotes omitted); *See Varig Airlines,* 467 U.S. at 811–12, 104 S.Ct. at 2763.

The immunity covers "[n]ot only agencies of government ... but all employees exercising discretion." The type of the decision or conduct rather than the status of the employee governs whether immunity is waived as to a given claim. *Varig Airlines* at 813, 104 S.Ct. at 2764; *Dalehite,* 346 U.S. at 33, 73 S.Ct. at 966–67. The doctrine of governmental immunity covers decisions respecting planning, *Dalehite,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427, decisions that call for a weighing of competing interests, *Canadian Transportation Co. v. United States,* 663 F.2d 1081, 1087 (D.C.Cir.1980), that require an assessment of the practicability or feasibility (including considerations of budgetary and staffing constraints) of a proposed course of action, *Wiggins v. United States,* 799

F.2d 962 (5th Cir.1986); *Gercey v. United States*, 540 F.2d 536, 538 (1st Cir.1976).[12]

Under the facts of this case Plaintiffs' contention that the government failed to establish a contingency plan faults "textbook" discretionary function. The Coast Guard and its COTPs have discretion over how the public interest of various port communities would be best served. *Gercey v. United States*, 540 F.2d 536 (1st Cir.1976). The Captain of the Port's decision not to give firefighting contingency plans at Port Canaveral high priority was based upon considerations of resources and numerous other concerns. As noted by the Supreme Court, determinations in establishing plans are not actionable. *Dalehite*, 346 U.S. at 35–36, 73 S.Ct. at 967–68. However desirable such contingency planning may be, decisions as to whether, where and when to expend time and resources to develop such plans are entrusted to the Coast Guard's judgment and are not reviewable by this Court.

### Duty to Plaintiff

■ Even if the Coast Guard's failure to establish a contingency plan at Cape Canaveral could be considered, as Plaintiffs suggest, a negligent failure to carry an established Coast Guard policy, the United States owed no duty to Plaintiffs.

It is Plaintiffs position that it does not quarrel with the Coast Guard's failure to establish a contingency plan as a discretionary function, but that the Coast Guard had an announced policy which instructed all Captains of the Ports to establish a firefighting contingency plan.

The "instruction" according to Plaintiff was promulgated in the *Marine Safety Manual*[13] and by public statements and reports by the Coast Guard Commandant in

1976 and 1981 which announced: "... District Commanders, COTP's ... are required to assure the ports within their jurisdiction have current and effective contingency plans, supported by the port community to provide adequate response by the available federal state, municipal and commercial resources to fires, and other accidents ..." By these directives and policy statements the Plaintiffs conclude that the Captain of the Port was required to develop a contingency plan for Cape Canaveral and having failed to do so, the Coast Guard should be liable in fact.[14]

An agency of the United States may not undertake a public duty beyond the undertaking authorized by Congress. *See, e.g., LeSuer v. United States*, 617 F.2d 1197, 1199 (5th Cir.1980); *Thompson v. United States*, 592 F.2d 1104, 1110 (9th Cir.1979); *Castillo v. United States*, 552 F.2d 1385, 1389 (10th Cir.1977); *Market Insurance Co. v. United States*, 415 F.2d 459, 462–64 (5th Cir.1969). It follows, absent express statutory authority, that the Coast Guard could not create, through any internal directive, or even by a duly promulgated federal regulation, a duty of care binding upon the United States.

It is well established that internal government manuals do not create duties of care to the public, nor do internal regulations have force of law. *Doe v. United States*, 718 F.2d 1039 (11th Cir.1983); *Zabala Clemente v. United States*, 567 F.2d 1140 (1st Cir.1978). This is especially true of agency manuals containing statements of policy, or rules of agency practice and procedure which have not been promulgated in accordance with procedural requirements for rule-making and are intended only for use by agency personnel. *See, e.g., Gatter v. Nimmo*, 672 F.2d 343, 347

---

**12.** Plaintiffs' reliance upon *Griffin v. United States*, 500 F.2d 1059 (3d Cir.1974), as "good post–Varig law" is misplaced. The Third Circuit has overruled *Griffin*. *Berkovitz v. United States*, 822 F.2d 1322, 1332 (3d Cir.1987).

**13.** *Marine Safety Manual, supra* note 11, at 86–6–5.

**14.** Plaintiff's theory in this regard is summarized in its post trial memorandum as follows:

In our case the failure to ensure that the contingency of a shipboard fire in a U.S. port as properly planned for did itself cause harm; because of the absence of proper planning and discretion the untrained CCVFD firefighters ran amok, opened up the sealed fire zone, and caused a "captive" fire to rage out of control.

(p. 38)

(3d Cir.1982). As noted in *Zabala Clemente,* government agencies cannot use their internal guidelines to impose judicially enforceable standards on the public and the public cannot use them in reverse to create enforceable standards for the agency. *Zabala Clemente,* 567 F.2d at 1144.

Numerous courts have recognized that internal government manuals do not establish a duty of care on the part of the United States to the public. *LeSuer v. United States,* 617 F.2d 1197, 1199 (5th Cir.1980) (Army Corps' safety regulations cannot create duty of care); *In re American Oil,* 417 F.2d 164, 170 (5th Cir.1969) (Coast Guard's search and rescue plan imposes no duty on government); *Daley v. United States,* 499 F.Supp. 1005, 1010 (D.Mass. 1980) (Coast Guard manuals do not define duty of care owing to public); *Home Shipping Company, S.A. v. United States,* 239 F.Supp. 226, 229, 231–32 (D.Del.1965) (Coast Guard manual for internal use only and cannot create a duty of care). The Court concludes that the government owed no duty to Plaintiffs to prepare a firefighting contingency plan. Accordingly, Plaintiffs' third claim fails to state a claim upon which relief can be granted.

*Proximate Cause*

▪ Even assuming arguendo that a duty existed to formulate a contingency plan, which the Court has found it did not, the Court finds that the absence of such a plan was not the proximate cause of Plaintiffs' damages. This claim rests upon speculation and conjecture which, even if taken as true, fail to demonstrate the fire would have been extinguished sooner. As a predicate to the determination of causation, it is necessary to decide whether the fire was contained prior to docking.

*Was the Fire Buttoned up Prior to Docking?*

The evidence was in conflict regarding whether the fire was contained or "buttoned up" prior to docking. The crew of the vessel testified that flames were no longer visible in cabin 414 at time of the Plumber's last attack just prior to docking

and that there was only smoke and heat in the "A" deck corridor. There was extensive testimony regarding whether the fire doors in the forward stairwell on the "A" Deck were closed; whether any air could have entered the fire zone; whether the ship's air conditioning system was still working, ventilating the fire; and whether the fire had spread to any of the upper decks forward of the fire zone and whether the fire dampers prevented the spread of the fire through the fire zone bulkheads.

Based upon the evidence, the Court finds that the fire was neither sealed up nor contained prior to docking. The testimony clearly demonstrated that the crew failed to turn off the ship's air conditioning system in the car deck, allowing the introduction of fresh air until the Coast Guard secured the system. The crew also turned on the air conditioning system forward shortly after arrival. The fire was growing, spreading and continued to receive oxygen through the open doors at frames 153 and 179, and other natural passageways and inlets. The Court further finds that passages and spaces in accommodation areas of passenger ships with low natural convection make it extremely difficult, if not impossible, to extinguish a fire simply by closing doors. Thus, even assuming the fire was located only in the "A" deck cabins and spaces upon arrival, merely closing fire doors would not have altered subsequent events.

The overwhelming evidence demonstrated that when the ship docked the fire was out of control. During the long trip to port the fire developed from a small circular flame on the floor of cabin 414 into a multi-cabin blaze with fire sandwiched between the decks. The Chief Officer testified that fire aboard a passenger ship will spread upward in seconds and horizontally in minutes if not promptly extinguished. The fire burned for over an hour and a half before docking. Indeed, even as the ship proceeded to port, the testimony revealed that the main deck was heating up and it was impossible to stay in the "A" deck due to the extraordinary heat. Initial assault shore firefighters described having to

crawl forward on their stomachs upon boarding due to intense heat. On several occasions CCVFD personnel had to retreat when ship's hoses burst leaving them unprotected and defenseless.

In any event, when the vessel docked the CCVFD boarded and took all actions which they felt, based upon their training and experience, were appropriate to combat the fire. Even though there was a disagreement as whether to ventilate or not there was no evidence that a contingency plan would have changed the procedures that *were* implemented. The evidence was that a contingency plan, at best, would have stated that ventilation is one accepted practice for fighting ship fires. In fact, the experts agreed, despite the salutory effect of a contingency plan, under the facts of this particular case, a port contingency plan would not have made any difference in how the fire was handled. The Court finds that however desirable such contingency plans generally are, the absence of a plan was not a proximate cause of the Plaintiffs' damages.

### Counterclaim for Salvage

The United States filed a counterclaim and a third-party claim against Scandanavian World Cruises (Bahamas) Ltd. for salvage based upon its efforts to save the *Scandinavian Sea*. However, these claims, having been filed more than two years after the incident, are time-barred. 46 U.S.C. § 730 ("A suit for the recovery of remuneration for rendering assistance or salvage services shall not be maintainable if brought later than two years from the date when such assistance or salvage was rendered.").

The United States cites 46 U.S.C. § 731, which, it argues, makes § 730 inapplicable to salvage claims for the government or its vessels. In *Basic Boats, Inc. v. United States*, 311 F.Supp. 596 (E.D.Va.1970), the court recognized the authority of the First Circuit's holding in *United States v. the James L. Richards*, 179 F.2d 530 (1st Cir. 1950) and thereby rejected the application of § 731 because it deals only with salvage of, not by, government ships. The court in *Basic Boats* denied, on the basis of the § 730 statute of limitations, the United States' counterclaim for salvage by a destroyer which had negligently damaged plaintiff's sailboat in attempting rescue operations. The same result must be reached in this cause: the United States' and the CCVFD's claim for salvage is time barred; § 731 of the Salvage Act is inapplicable.

For the reasons stated it is ORDERED AND ADJUDGED that:

1. Plaintiff DFDS' claim is dismissed and Defendants United States, CCVFD and MIVFD shall go hence without delay.

2. Defendants United States and CCVFD's claims for salvage are dismissed.

3. Defendant United States' claim for contribution and indemnity against Scandinavian World Cruises (Bahamas) Ltd. is dismissed.

APPENDIX 1

"A" DECK

CATERING STAFF ACCOMMODATION DURING WINTER TRADE.

FORWARD STAIRWELL

ROOM 416, ORIGIN OF FIRE

FIRE SCREEN DOOR AT FRAME 153

11